**2021 UT 12**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

BOBBIE D. WIDDISON,
*Appellant,*

*v.*

STATE OF UTAH and the UTAH BOARD OF PARDONS AND PAROLE,
*Appellee.*

No. 20161043
Heard September 20, 2019
Filed April 29, 2021

On Direct Appeal

Third District, Salt Lake
The Honorable Todd Shaughnessy
No. 140903911

Attorneys:[1]

Lorenzo K. Miller, Draper, for appellant

Sean D. Reyes, Att'y Gen., Brent Burnett, Asst. Solic. Gen.,
Salt Lake City, for appellee

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, and
JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE authored a concurring opinion.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1    In 2011, the Utah Board of Pardons and Parole (Board) notified Bobbie Widdison that she would be paroled in 2018. In 2013, the Board rescinded Widdison's parole date and ordered her to serve

---

[1] John Mejia, Leah Farrell, Jason Groth, Salt Lake City, for amicus curiae.

her entire life sentence. The Board rescinded Widdison's parole date based on unadjudicated allegations that Widdison had abused a child and supplied a minor with drugs and alcohol.

¶2　Widdison filed a petition for extraordinary relief arguing that the Board's decision to rescind her parole date violated her state and federal constitutional rights. And she asked the district court to reinstate her original parole date. The district court rejected those arguments and granted the State's motion for summary judgment.

¶3　After Widdison filed this appeal, the Board paroled her. Widdison concedes that the Board's decision moots this matter because she has received the relief she sought before the district court. Widdison nevertheless emphasizes the importance of the issues she raises and invites this court to hear her arguments under our public interest exception to the mootness doctrine. We acknowledge the importance of the concerns Widdison advances, but Widdison has not convinced us that if we do not decide her case, we will likely deprive ourselves of any opportunity to review the types of issues she raises. We therefore decline Widdison's invitation and dismiss this case as moot.

## BACKGROUND

¶4　The State of Utah charged Bobbie Widdison with the murder of her child, as well as three counts of felony child abuse and three counts of misdemeanor child abuse based on injuries the child sustained before death. At trial, the State offered evidence that Widdison had mistreated two other children, but those allegations were never adjudicated.

¶5　A jury convicted Widdison of first degree felony murder. The jury also convicted Widdison on the remaining charges, although it reduced one felony charge to a misdemeanor. The district court sentenced Widdison to five years to life in prison for the murder. It also sentenced Widdison to one to fifteen years for each felony and one year for each misdemeanor. The court ordered the child abuse counts to run concurrently with each other but consecutively to the murder sentence.

¶6　In 2011, the Board held a parole hearing for Widdison and granted her a parole date of May 8, 2018, subject to future review and modification.

¶7　Two years later, a witness (Witness) from Widdison's original trial testified at a Board hearing on an unrelated matter and mentioned that Widdison had supplied her with drugs and alcohol

when she was a minor. Based on this information, the Board scheduled a hearing to consider whether it should rescind Widdison's parole date.

¶8 The Board did not originally tell Widdison why it had scheduled a rescission hearing. After Widdison inquired, the Board disclosed the allegation that had been made and explained that she would have an opportunity to respond.

¶9 At the rescission hearing, the Witness testified about the drugs and alcohol she claimed Widdison had given her when she was underage. The Witness also testified that Widdison had abused her other children. The Board member overseeing the hearing questioned Widdison about the drugs and alcohol. The Board member also questioned Widdison about her child's death.

¶10 After the hearing, the Board collected more documents from the State's original investigation, provided a packet of these documents to Widdison, and scheduled a second hearing. At this hearing, the Board member questioned Widdison about, among other things, the alleged abuse of her other children. At the hearing and in a letter sent to the Board afterward, Widdison denied the new allegations. Despite her denials, the Board rescinded Widdison's parole and "expired" her life sentence.[2]

¶11 Widdison filed a petition for extraordinary relief alleging various violations of her federal and Utah constitutional rights. Widdison requested that the district court order her original parole date reinstated. The district court granted summary judgment in favor of the Board. Widdison appealed and, while this appeal was pending, the Board paroled Widdison and filed a suggestion of mootness.

## ANALYSIS

### I. This Case Is Moot

¶12 Widdison concedes her case is moot. As a general rule, if our decision cannot affect the rights of the parties before us, the matter is moot and, absent an exception to our mootness doctrine,

---

[2] In this context, "expired" is a term the Board employs to express the concept that, absent some intervening change, an inmate should expect to never be paroled and to serve the entirety of her sentence. In this case, this meant that Widdison anticipated spending the rest of her life in prison.

we will not hear the matter. *See State v. Steed*, 2015 UT 76, ¶ 1, 357 P.3d 547. In her petition, Widdison requested an evidentiary hearing, an order declaring that the Board's actions violated her constitutional rights, the reinstatement of her parole date, and an order prohibiting the Board from retaliating against her. The Board has paroled Widdison; any relief relating to prerelease proceedings or retaliation would have no legal effect on Widdison or her rights.

## II. Mootness Exceptions

¶13  Because this matter is moot, Widdison asks us to apply the "public interest" exception and address the legal issues she presents.

### A. The Elements of the "Public Interest" Exception

¶14  The "public interest" exception carries a slightly deceptive name, and, in an effort to resolve this confusion, we have previously suggested that this exception should simply be referred to as an exception to the mootness doctrine. *See Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 33, 289 P.3d 582. Under this exception, it is not enough that an appellant convince us that the appeal presents an issue of public concern. Rather, we will decide a moot issue when a litigant can demonstrate that the issue will "(1) affect the public interest, (2) be likely to recur, and (3) because of the brief time that any one litigant is affected, be likely to evade review." *State v. Steed*, 2015 UT 76, ¶ 7, 357 P.3d 547.[3] Widdison

---

[3] We have also recognized that the existence of collateral legal consequences can allow a court to hear a matter that we would otherwise consider moot. This court recently examined this principle in *State v. Legg* and explained that the party asserting the existence of collateral legal consequences bears the burden of convincing us that they exist—except in narrow circumstances where they are presumed. 2018 UT 12, ¶¶ 17, 25, 33, 417 P.3d 592; *Duran v. Morris*, 635 P.2d 43, 45–46 (Utah 1981). Collateral consequences are generally presumed to flow from criminal convictions, *Legg*, 2018 UT 12, ¶ 17, but not from later administrative rulings like intra-prison administrative decisions, *Duran*, 635 P.2d at 45, or parole hearings, *Legg*, 2018 UT 12, ¶ 25 (declining to extend the presumption of collateral legal consequences to appeals of probation revocations); *Spencer v. Kemna*, 523 U.S. 1, 14 (1998) (declining to extend the presumption to appeals of parole revocation).

In her opposition to the suggestion of mootness, Widdison has not argued that collateral consequences flow from the Board's

(continued ...)

argues that all three considerations are present here. Although we agree with Widdison that her appeal raises issues that affect the public interest and are likely to recur, we are not convinced the issues she raises are likely to evade review.

¶15 The first thing someone asking us to address a moot issue under this exception must show is that the matter affects the public interest. In *McRae v. Jackson*, we noted that "class actions, questions of constitutional interpretation, issues as to the validity or construction of a statute, or the propriety of administrative rulings" frequently raise issues of public concern. 526 P.2d 1190, 1191 (Utah 1974), *overruled on other grounds by Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, 289 P.3d 582; *see also State, in Interest of F.S.B.*, 2014 UT App 235, ¶ 3, 336 P.3d 1073 (holding that a question of sufficiency of the evidence did not affect the public interest).

¶16 Widdison contends that whether the Board can rescind a parole date based on unadjudicated conduct presents an issue of first impression, implicates important constitutional rights, and has the potential to affect all inmates subject to Utah's indeterminate sentencing scheme. We agree.

¶17 The second factor requires a party to demonstrate that the issue is likely to recur. "Under settled case law, 'a mere physical or theoretical possibility' of recurrence is insufficient." *Utah Transit Auth.*, 2012 UT 75, ¶ 36 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).[4] A party must convince us that the issue will arise again.

---

decision to parole her; she only "requests that this Court . . . address the issues presented in her appeal under the public interest exception." At oral argument, counsel made a general assertion that Widdison is being "treated differently" than if she had been paroled on her original parole date, but there is no record support for this belated assertion. In other words, Widdison has not shown any cognizable collateral legal consequences, nor that there are any that our case law instructs us to presume.

[4] The Board argues that this factor is not met here because the issue is not likely to recur with respect to Widdison. This is not Utah law. *See Ellis v. Swensen*, 2000 UT 101, ¶ 27 & n.5, 16 P.3d 1233. Although some jurisdictions do require that the issue will recur to the same complainant, Utah is not alone in rejecting that requirement. *Compare Commonwealth v. Yameen*, 516 N.E.2d 1149,

(continued ...)

¶18 Widdison notes that the Board makes rescission and parole decisions regularly, including in circumstances involving unadjudicated allegations against the inmate. And Widdison's argument comports with our experience. *See, e.g., Neese v. Utah Board of Pardons & Parole*, 2017 UT 89, ¶ 27, 416 P.3d 663; *Blanke v. Board of Pardons & Parole*, 2020 UT 39, ¶¶ 8–9, 467 P.3d 850. We agree with Widdison that the issue will likely recur.

¶19 Third, it is not enough that the issue be likely to recur, it must also be *likely* to evade review. *Steed*, 2015 UT 76, ¶ 8. We have often restated this requirement as mandating that the issue should be "inherently short in duration." *See, e.g., id.* ¶ 9; *Utah Transit Auth.*, 2012 UT 75, ¶ 37 ("The types of issues likely to evade review are those that are inherently short in duration. . . ." (quoting *In re Adoption of L.O.*, 2012 UT 23, ¶ 10, 282 P.3d 977)); *Guardian ad Litem v. State ex rel. C.D.*, 2010 UT 66, ¶ 14, 245 P.3d 724 (same). Examples of these short matters include election challenges, *Ellis v. Swensen*, 2000 UT 101, ¶ 27, 16 P.3d 1233 ("[B]allots do not have to be produced until seven days before the election."), and pregnancy, *see Utah Transit Auth.*, 2012 UT 75, ¶ 37 n.23 (noting that *Roe v. Wade,* 410 U.S. 113 (1973) was heard because the issue was "capable of repetition, yet evading review").

¶20 We have also held that issues can evade review because of the likely actions of a party. *See, e.g., State ex rel. C.D.*, 2010 UT 66, ¶ 14 (citing *Anderson v. Taylor*, 2006 UT 79, 149 P.3d 352 and *Kearns-Tribune v. Salt Lake Cnty. Comm'n*, 2001 UT 55, 28 P.3d 686 as examples of inherently short issues); *Utah Transit Auth.*, 2012 UT 75, ¶ 37 & nn.21–22 (citing *McBride v. Utah State Bar*, 2010 UT 60, 242 P.3d 769 and *Kearns-Tribune* as examples of inherently short issues); *State v. Steed*, 2015 UT 76, ¶ 11 n.9, 357 P.3d 547 (recognizing an "alternative analysis" in our case law for evading review where "the likely choice of future litigants" creates only a short "window for an appeal"); *Poulton v. Cox*, 2016 UT 9, ¶ 7, 368 P.3d 844 (citing *Steed* and

---

1150 (Mass. 1987) (not requiring the same complainant be affected), *and Gunaji v. Macias*, 31 P.3d 1008, 1011 (N.M. 2001) (same), *and Loisel v. Rowe*, 660 A.2d 323, 330 (Conn. 1995) (allowing the issue to recur to an identifiable group for which the party can act as a surrogate), *with Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam) (requiring that the issue recur to the same complainant), *and Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (same), *and Anderson v. N. Carolina State Bd. of Elections*, 788 S.E.2d 179, 188 (N.C. Ct. App. 2016) (same).

noting closed political meetings and bar admissions as inherently short issues).

¶21 In *McBride v. Utah State Bar*, we held that an issue regarding the administration of the bar exam would evade review because the exam was held every six months and the petitioning applicant could just retake the exam. 2010 UT 60, ¶ 15.

¶22 *McBride* echoed reasoning that we had employed in other cases. For example, in *Anderson v. Taylor*, a petitioner requested records of the search warrant executed by police at his home. 2006 UT 79, ¶ 4. A district court clerk informed him that they did not have the documents or a record of the warrant. *Id.* The Provo City Police Department returned the paperwork to the court nine days later, but the magistrate did not file the documents with the clerk's office. *Id.* Anderson filed a petition for extraordinary writ for an order requiring courts to retain copies of all the search warrants they issue, as well as documents used to obtain the warrant. *Id.* ¶ 6. After Anderson filed the petition, the court filed the documents Anderson had sought and argued that Anderson's claim was now moot. *Id.* ¶¶ 7, 9. We nevertheless applied the public interest exception, reasoning that the issue would likely evade review because "once a challenge is initiated, law enforcement will have every incentive to immediately file the documentation supporting the search, thereby mooting the particular claim." *Id.* ¶ 11.

¶23 Similarly, in *Kearns–Tribune Corp. v. Salt Lake Cnty. Comm'n*, a newspaper publisher challenged the Salt Lake County Commission's decision to go into closed session. 2001 UT 55, ¶ 1. The newspaper argued that the decision violated the Utah Open and Public Meetings Act. *Id.* ¶ 5. While the challenge was pending, the Commission released minutes of the closed session and argued that the minutes' release mooted the suit. *Id.* ¶ 32. We rejected that argument and concluded that the issue was likely to evade review because public officials were likely to publish meeting minutes before a matter could be completely litigated. *Id.* ¶ 33.

¶24 In other words, we have recognized that an issue may evade review because of the intrinsically temporary nature of the issues presented—like election disputes and pregnancy. And we have recognized that an issue may be likely to evade review when we are convinced that a party's actions will persistently keep the issue out

of our reach—like refusals to release warrant reports and releasing minutes from closed public meetings.[5]

---

[5] Although Widdison has not argued for its application, we note the seemingly parallel notion of "voluntary cessation" and Utah's recognition of the principle in *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 42, 364 P.3d 1013; *see also Teamsters Local 22 v. Utah Transit Auth.*, 2018 UT 33, ¶¶ 16–21, 424 P.3d 892 (rejecting a party's argument based on federal voluntary cessation cases because those cases were distinguishable). Generally, "[a] plaintiff's claim is not rendered moot by the voluntary cessation of a challenged practice which the defendant is free to resume at any time." *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1214 (10th Cir. 2015). Thus this principle may be more aptly described as a question of whether the case is actually moot and not an exception to mootness. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct . . . does not make the case moot.")

We have not had much opportunity to develop this principle. Nor is it a model of clarity in other jurisdictions. We do not agree with the concurrence that this principle is "well-developed" in Utah, *infra* ¶ 97, when our jurisprudence on the doctrine consists of two cases that simply found the petitioners' circumstances distinguishable from federal case law on the matter. *See Mercer*, 2015 UT 80, ¶ 42; *see also Teamsters*, 2018 UT 33, ¶¶ 16–21.

We note for future cases a number of lingering questions surrounding the principle. *Compare Ind*, 801 F.3d 1209, at *1215-16 (analyzing whether the same complainant will be affected again), *with People for the Ethical Treatment of Animals v. United States Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, at *156-59 (D.C. Cir. 2019) (analyzing only whether the challenged practice will happen again); *compare DeFunis v. Odegaard*, 416 U.S. 312, 318-19 (1974) (suggesting that granting the requested relief while maintaining the challenged practice makes the voluntary cessation principle inapplicable), *with Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*, 581 F.3d 1169, 1172–75 (9th Cir. 2009) (applying voluntary cessation to ensure a party cannot escape litigation by giving in to one plaintiff without renouncing the challenged policy); *see also Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 207–208, 207 n.17 (Tenn. 2009) (discussing the ambiguity surrounding voluntary cessation).

Here, Widdison has challenged the Board's actions only in relation to herself, and she will not likely again be subject to

(continued …)

### B. We Have Never Rejected This Formulation of the Exception

¶25 The concurrence levels two criticisms at our invocation of the cases that hold that the mootness exception can apply when the actions of a party will likely cause the issue to evade review. The concurrence argues that we have eliminated this thinking from our jurisprudence. *Infra* ¶ 72. It also argues that even if we haven't, the cases on which we rely do not persuasively say what we have said they say.[6] *See infra* ¶ 104. The first assertion is demonstrably incorrect. The second lies in the eye of its beholder, but this court has already stated how it beholds these cases. And, since no one has asked us to overrule that case law, the concurrence simply advises us what its opinion would be if someone were to someday attempt to convince us to overturn our precedent.

1. Neither *Utah Transit Authority*, Nor *Steed*, Nor *Teamsters* Eliminated a Party's Ability to Argue that We Should Hear an Otherwise Moot Case Because the Other Party's Actions Would Likely Cause the Issue to Evade Review

¶26 According to the concurrence, we have, in three cases, implicitly rejected the principle that an issue can likely evade review because of a party's likely actions: *Utah Transit Auth.*, 2012 UT 75; *Steed*, 2015 UT 67; and *Teamsters Local 222 v. Utah Transit Auth.*, 2018 UT 33, 424 P.2d 892. *Infra* ¶ 104. And this alleged rejection is central

---

rescission hearings. If she were, it would be because of her own violation of parole or future criminal behavior. We do not presume that will recur. *See Honig v. Doe*, 484 U.S. 305, 320 (1988) ("[W]e generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury."); *c.f. Legg*, 2018 UT 12, ¶ 30 (stating that the alleged possible consequences "are contingent upon [the petitioner] again violating state law. [The petitioner] himself is 'able—and indeed required by law—to prevent such a possibility from occurring.'" (citation omitted).

[6] The concurrence also assails this court's precedent as "lightly theorized," *infra* ¶ 71, "less-theorized," *infra* ¶ 72, "stretched," *infra* ¶ 71, "unnecessary," *infra* ¶ 110, and "incorrect" *infra* ¶ 111. Even if we were to agree with that assessment, we would note that no one, except the concurrence, has asked us to overrule the case law we rely on. And we prefer to afford *stare decisis* weight to these cases until a party attempts to shoulder its burden of overturning precedent.

to most of the concurrence's arguments. A neutral reading of those cases demonstrates that we have not overruled cases like *Anderson*, *McBride*, and *Kearns-Tribune*.

¶27 *Utah Transit Authority*, for one, did not address this question head on. Indeed, it referenced *McBride* and *Kearns-Tribune* in its analysis. 2012 UT 75, ¶ 37 nn.21–22. *Steed*, on the other hand, did face this question head on, but it expressly acknowledged that our case law recognizes that a party's actions can cause an issue to evade review. 2015 UT 76, ¶ 11 n.9. And it did so in the face of a concurring opinion that said we should remove that principle from our cases. *Id.*; *id.* ¶ 20 (Lee, J., concurring). Finally, *Teamsters* did not opine on this mootness exception, let alone overturn the cases we cite. *See generally* 2018 UT 33.[7]

¶28 In *Utah Transit Authority*, a union sought to compel the arbitration of disputes arising out of its collective bargaining agreement with the Utah Transit Authority. 2012 UT 75, ¶ 6. Before this court could rule on the issue, the parties agreed on the terms of their new collective bargaining agreement. *Id.* ¶ 9. Both parties urged us to nonetheless rule on the dispute. *Id.* ¶ 10. We declined. *Id.* ¶ 11.

¶29 We did not, as the concurrence argues, opine on our cases that stand for the proposition that a party's actions can cause an issue to be likely to evade review. We did not need to address that case law because we concluded that we did not think the issue would repeat. *Id.* ¶¶ 35–36.

¶30 Instead, we outlined the three-part test for the public interest exception that we apply today. *Id.* ¶¶ 30–32. We did, as the concurrence notes, articulate the third prong of the test as involving issues that are "inherently short in duration." *Id.* ¶ 37 (citation omitted) (internal quotation marks omitted). But we never said, as the concurrence represents, that when we referenced issues that are "inherently short in duration," we were rejecting our case law that

---

[7] A reader might see the number of paragraphs we, and the concurrence, spend discussing this question and think that it is a difficult issue to resolve. It is not. Distilled to its essence, the question is this: Did this court overrule cases standing for the proposition that an exception to mootness applies when a party's likely actions will cause an issue to evade review when we: (1) cited those cases favorably in the case the concurrence says we overruled them; and (2) *expressly declined to overrule them* in a subsequent case.

allows a party to argue that an issue is likely to evade review because of another party's actions. *Id.* (citation omitted). Quite to the contrary, we recognized the issue in *Kearns-Tribune* as one that "would evade review because public officials were likely to publish the notes from the closed portion of the meeting before the matter was litigated." *Id.* & n.21 (citing *Kearns-Tribune*, 2001 UT 55, ¶¶ 32–33).

¶31 In other words, not only did *Utah Transit Authority* not overturn *Kearns-Tribune*, it cited it favorably. That's a weird way for us to overrule something. And, lest one think that was an aberration, *Utah Transit Authority* did the same thing with *McBride*, which we cited as an example of a "rapidly resolving issue[]" in which we had allowed a party to successfully invoke an exception to mootness. *Id.* & n.22. This makes the concurrence's assertion that we have gone astray by "resurrecting *Kearns-Tribune, Anderson,* and *McBride* in [a] way [that] clearly overrides *Utah Transit Authority*" entirely curious.[8] *See infra* ¶ 85. *Utah Transit Authority* didn't kill these cases; it blessed them.

¶32 The concurrence also suggests that *Utah Transit Authority* holds that the mootness exception is "limited to those 'rapidly

---

[8] The concurrence misstates what we said in *Utah Transit Authority* when it summarizes the holding as "we held that the exception is triggered *only* for 'matter[s] of '*inherently* short' duration.'" *Infra* ¶ 78 (emphasis added). We did not use the qualifier "only," and we did not say we were rejecting other ways an issue might evade review. This becomes clearer if, instead of paraphrasing, we quote the opinion.

> [T]he parties [have not] shown that the matter is so discrete or rapidly resolving as to be "capable of evading review." "The types of issues likely to evade review are those that are inherently short in duration so that by the time the issue is appealed, a court is no longer in a position to provide a remedy." We have found such rapidly resolving issues in election matters, closed political meetings, bar admissions, and abortion cases.

*Utah Transit Auth.*, 2012 UT 75, ¶ 37 (citations omitted).

*Kearns-Tribune* is the case that discussed "closed political meetings." And *McBride* held that "bar admissions" decisions would likely evade review.

resolving issues' that are '*inherently* short in duration,' as a result of something other than 'the parties' actions.'" *Infra* ¶ 74. But the concurrence is again rewording *Utah Transit Authority*, this time taking a three-word phrase, "the parties' actions," and suggesting that our description of the mootness exception included this limitation.

¶33 But this is not what we said. We defined rapidly resolving issues as including the "closed political meetings" discussed in *Kearns-Tribune* and the "bar admissions" at issue in *McBride. See Utah Transit Authority,* 2012 UT 75, ¶ 37 & nn.21, 22. We then followed that description by saying that the dispute in *Utah Transit Authority* was "not of that ilk," *id.* ¶ 38, and that the dispute at issue there was "no more capable of repetition but evading review than any of a broad range of garden-variety disputes," *id.* ¶ 39. In other words, one of the "reasons we gave for our decision," *infra* ¶ 80 n.18, was that the issue in *Utah Transit Authority* did not resemble those in *Kearns-Tribune* and *McBride.*[9]

¶34 Perhaps it is because the dispute in *Utah Transit Authority* resolved based on the parties' actions that the concurrence argues that an issue cannot be "inherently short" or "rapidly resolving" if a party's actions cause the inherent shortness or the rapid resolution. But that is not what *Utah Transit Authority* says.

¶35 Our one-sentence discussion of "the parties' actions" analyzed the specific facts *Utah Transit Authority* presented. *Id.* ¶ 38. We stated that the parties "in *this* case" resolved their dispute and the case was mooted as "a function of the parties' actions in light of an arbitration ruling." *Id.* ¶ 38. This was case-specific analysis; our application of our test to the facts presented. Simply stated, there was nothing about the issue in *Utah Transit Authority* that suggested it would be resolved by a party every time it arose. Thus, it was unlike those cases we had favorably cited, like *Kearns-Tribune* and *McBride*, where the exception applied because the issue was likely to

---

[9] The concurrence complains that our analysis elevates "short footnote parentheticals over the actual reasons we gave for our decision in *Utah Transit Authority*." *Infra* ¶ 80 n.18. N.B. that the portion of the decision we cite is found in the text of the *Utah Transit Authority* decision. And it is not surrounded by parentheses. The discussion we reference was part of the "reasons we gave for our decision."

evade review. And, therefore, the exception did not apply to the issue in *Utah Transit Authority.*

¶36 Even more curious is the concurrence's argument that *Steed* supports its worldview. *Infra* ¶¶ 104, 126, 129; *see Steed*, 2015 UT 76. In *Steed*, this court recognized that the "traditional" approach to the public interest exception did not focus on "collateral choices future parties are likely to make." *Steed*, 2015 UT 76, ¶ 11. However, we also recognized the "alternative analysis" in our case law that looks at whether the issue is likely to evade review because of the future "likely choices" of the party. *Id.* ¶ 11 n.9. And despite Justice Lee's invitation to overturn that case law, the rest of this court explicitly declined to overrule the alternative analysis. *Id.* ("Justice Lee argues in his concurrence that we should overrule *McBride*. We decline to do so." (citation omitted)).[10]

¶37 Like we did in *Steed*, we again recognize what our case law holds and honor *stare decisis*. And we, as we did in *Steed,* reject the invitation to disregard our case law where we do not have a party in front of us shouldering the burden a party faces to convince us to relegate our precedent to the dustbin.

¶38 That a majority of this court refused to overturn this case law in *Steed* exposes the audacity of the concurrence's assertion that under "established principles of *stare decisis*" we "should conclude that the cited premises of our older cases" such as *McBride* and *Kearns-Tribune* "have been overtaken by more recent authority" like *Steed* and *Utah Transit Authority. Infra* ¶ 126. That is, the concurrence faults us for not recognizing that *Utah Transit Authority* stealthily overturned cases like *McBride* even though *Steed* explicitly refused to do so. Stated differently, having failed to convince this court to overturn *McBride* in *Steed*, the concurrence posits that we somehow did so anyway and that we should give *stare decisis* respect to a conclusion we explicitly refused to reach.

---

[10] Had we, as the concurrence asserts, overturned this case law in *Utah Transit Authority*, we would not have needed to engage in this discussion in *Steed*. At the very least, one would have expected the *Steed* concurrence to say what the concurrence says here: that *Utah Transit Authority* had already eliminated that variant of the mootness exception. Notably, the *Steed* concurrence argued that "I would overrule *McBride*" and not that *Utah Transit Authority* had already done the deed. *Steed,* 2015 UT 76, ¶ 20 (Lee, A.C.J., concurring in part and concurring in the judgment).

¶39 The concurrence avers that overruling prior case law "doesn't depend on whether we drafted a [list] of every prior inconsistent holding." *Infra* ¶ 80. We understand the principle that an opinion may not anticipate all of the cases its holding will implicate. But that principle must certainly lose its potency when the holding discusses and favorably cites those cases. Again, *expressly relying on* cases like we did in *Utah Transit Authority* would be a funny way to *implicitly overrule* them. And an odd way of identifying them as a "prior inconsistent holding."

¶40 The concurrence asks us to take a leap of faith and believe that the five justices of the unanimous court in *Utah Transit Authority* mistakenly cited *Kearns-Tribune* and *McBride* to explain the exception, when, in fact, they meant to overturn those cases. And the concurrence wants us to believe that the unanimous court in *State ex rel C.D.* was daydreaming when it cited *Kearns-Tribune* and *Anderson* as examples of issues falling under the exception. 2010 UT 66, ¶ 14. And that we should believe that occurred because those justices "[in]correctly believed that [those] older cases were reconcilable with our more recent articulation of the law." *See infra* ¶ 80. This is beyond anything we could logically agree with.

¶41 The court in *Utah Transit Authority* specifically explained that the issue in *Kearns-Tribune* was the type of issue that was likely to evade review under the exception "*because public officials were likely to publish the notes* from the closed portion of the meeting before the matter was litigated." *Utah Transit Auth.*, 2012 UT 75, ¶ 37 n.21 (emphasis added). And it would be incomprehensible to think that the *Utah Transit Authority* court misunderstood that the issue in *McBride* would "evade review" because of the actions of a party.

¶42 Most importantly, as explained, we had the chance to correct this supposed "mistake" in *Steed*. Indeed, as the concurrence says, "The fact that a court may believe its older precedents are reconcilable with a recent holding likewise does not prevent that court from later acknowledging that the older precedents were always irreconcilable." *Infra* ¶ 83. But in *Steed* we had the chance to acknowledge the "mistake," and instead we did the complete opposite. We expressly rejected the dissent's imploration to overrule our case law that allows a party to show that an issue is likely to evade review because of a party's actions. *Steed*, 2015 UT 76, ¶ 11 n.9.

¶43 We simply cannot agree with the concurrence's central argument that somehow *Utah Transit Authority* held something it didn't say, overruled cases it used to explain the rule, and removed from our case law a principle that we later recognized still existed.

¶44 Finally, the concurrence argues that our opinion contradicts *Teamsters*, 2018 UT 33. *Teamsters* did not address the relevant question.[11] In *Teamsters*, a group of employees sought "a declaration

---

[11] The concurrence discusses the *Teamsters* decision at great length. *See infra* ¶¶ 86–103. As part of this, the concurrence argues that the discussion of ripeness and mootness in *Teamsters* defined the "relevant controversy" as involving "*this* [petitioner] in *this instance* at *this time*." *Infra* ¶ 91 (emphases in original). Thus, according to the concurrence, this means that "any attempt to allow an already-paroled inmate to invoke an exception to the mootness doctrine will implicate ripeness concerns" and that "future case[s] will still be moot if the inmate has already been paroled . . . notwithstanding any success in demonstrating" that the issue is likely to evade review because of the Board's likely actions. *Infra* ¶ 92. But this point is misplaced. We acknowledge that Widdison's case is moot. Here we are asking whether *an exception* to mootness applies.

The concurrence also suggests that the relevant controversy discussion from *Teamsters* implicates ripeness principles that prevent us from applying our recognized exception to mootness here. It is one thing to suggest that this is what our law should be. It is quite another to say that is what our law actually is and apply it in a case in which the parties have neither asked us to overturn our case law nor provided briefing on the topic.

The concurrence suggests we are "punt[ing] the issue because [we do] not want to deal with the messy consequences of [our] holding." *Infra* ¶ 100 n.25. The "messy consequences" only occur if we were to read *Teamsters* the way the concurrence does. The concurrence says that *Teamsters* can be read to say that every attempt to hear a moot case involves ripeness concerns. And the concurrence uses this to conclude that the variant of the mootness exception we address here cannot coexist with *Teamsters* because in addition to being moot, the dispute is unripe. If the concurrence reads *Teamsters* correctly, then *Teamsters* overruled *sub silentio* every variant of the mootness exception—even the one we all agree *Utah Transit Authority* recognized and preserved—because every variant of that exception to mootness would implicate ripeness concerns. A better reading of *Teamsters* is one that recognizes that we did not apply or discuss the mootness exception there because the parties did not argue it. And that the ripeness concerns the concurrence raises are dealt with by the way we articulate the mootness exception. A party must show that the moot issue is likely to recur. *Steed*, 2015 UT 76,

(continued ...)

of their right to organize" in a union. *Id.* ¶ 1. After the district court ordered that the employees did indeed have collective bargaining rights, the group voted not to unionize. *Id.* The employer-defendant invoked the voluntary cessation doctrine to argue that the case was not moot in an effort to convince us to rule on the mooted question. *Id.* ¶ 16. This court held that the federal voluntary-cessation cases the employer cited were distinguishable because they involved a defendant strategically mooting a case just long enough to get it dismissed. *Id.* ¶ 17. We said nothing about our three-pronged "public interest" exception, let alone the vitality of cases that *Teamsters* never referenced.[12]

---

¶ 7. It would strain credulity to believe that we recognized an exception to mootness that could never actually apply because every case falling into the exception also implicates an unripe future dispute. At the very least, nothing in *Teamsters* suggests that by reciting general ripeness principles, we intended to overrule an exception to mootness that the *Teamsters* parties never argued and that opinion did not address.

[12] The concurrence also suggests that *Teamsters* shows how our analysis here is incorrect because the voluntary cessation discussion in *Teamsters* and the public interest exception discussion in *McBride* are "two different tests for analyzing the same voluntary actions of a defendant," *infra* ¶ 126, and those tests would "open[] the door to two different results under the *same* set of facts." *Infra* ¶ 131 (emphasis in original). Contrary to the concurrence's description of *Teamsters*, we neither applied nor adopted the voluntary cessation doctrine in that case. We discussed it just long enough to note that a party had asked us "to find an exception to the mootness doctrine" based on federal case law and to "decline to do so because we [found] those cases distinguishable." *Teamsters*, 2018 UT 33, ¶¶ 16–17. At no point in *Teamsters* did we even mention the case in which we had discussed the voluntary cessation doctrine: *InnoSys, Inc. v. Mercer,* 2015 UT 80. And *InnoSys* did not discuss voluntary cessation in the context of our existing body of mootness jurisprudence. *Id.* ¶¶ 42–46.

To the extent there is tension between the voluntary cessation doctrine and the public interest exception, that is a problem *InnoSys* — and not our opinion — has created. But it is not clear that there is real tension between the approaches. Our "likely to evade review" case law does not require that the issue be likely to recur

(continued ...)

2. Contrary to the Concurrence's Assertion, *McBride*, *Anderson*, and *Kearns-Tribune* Support the Proposition for Which We Have Repeatedly Cited Them

¶45 The concurrence also assails our reliance on *McBride, Anderson*, and *Kearns-Tribune*. *Infra* ¶ 104. And the concurrence levels a bevy of reasons why we should not find them persuasive. But it is the concurrence's uninvited attempt to read these cases out of our jurisprudence that we find unpersuasive.

¶46 The concurrence disapproves of our reliance on *McBride*. *Infra* ¶ 112. Although the concurrence recognizes that in *McBride* we held, as we recognized in *Steed*, that an issue could evade review "because of the decisions those affected by the issue in the future would likely make," *Steed*, 2015 UT 76, ¶ 11 n.9, the concurrence dismisses *McBride* because it is allegedly "in tension" with our case law, *infra* ¶ 112. As described above, it is not.

¶47 The concurrence also takes issue with that fact that in *McBride* we said the issue would evade review because an examinee "could" just retake the exam. *Infra* ¶ 118; *see McBride,* 2010 UT 60, ¶ 15. This was consistent with the way the test had been described in other instances: that the issue must be "capable" of evading review, not "likely" to do so. *See, e.g., Steed*, 2015 UT 76, ¶ 8; *State ex rel. C.D.*, 2010 UT 66, ¶ 13; *Burkett v. Schwendiman*, 773 P.2d 42, 44 (Utah 1989). In *Steed*, we clarified that the test is that the issue must be "likely" to evade review, not just capable of evading review. 2015 UT 76, ¶ 8. And so the concurrence is correct that *Steed* revised *McBride* and other cases that articulated the test as "capable of evading review" instead of likely evading review. This was an important clarification. But it does not change what the concurrence concedes: *McBride* stands for the principle that an issue can evade review because of a

---

between the same parties, *Ellis*, 2000 UT 101, ¶¶ 26, 27, 27 n.5, 16 P.3d 1233, but the voluntary cessation doctrine might, *see Ind*, 801 F.3d 1209 at 1214 (10th Cir. 2015) (analyzing voluntary cessation in terms of whether the same complainant would be affected again). And to the extent that this tension exists, there is no need to take it up in a case where no party has asked us to resolve the tension by overruling the mootness exception, we have no briefing from the parties on the question, and we do not actually apply the exception to hear the case.

party's actions. *Steed* just instructed us that it must be *likely* to escape review.

¶48 The concurrence then attacks the premise of *McBride* because, in that case, we said we were exercising our "discretion" to consider whether the case was moot. *Infra* ¶ 113. Since *Utah Transit Authority* held that mootness was rooted in constitutional soil, the concurrence argues that discretion cannot be the basis of a mootness exception. *Infra* ¶ 113–15.

¶49 Although we used the word discretion, we did not simply say that we would exercise our discretion to hear a moot case. We applied the same three-part analysis that we apply here. *McBride*, 2010 UT 60, ¶ 15. We did not rule in McBride's case just because we thought we should. We ruled in McBride's case because the issue was one of public importance, that was likely to recur, but because of the actions of one of the parties, it would evade review. *Id.*

¶50 The concurrence also argues that *Anderson* does not provide a "firm foundation" for our holding. *Infra* ¶ 109. It bears noting that the concurrence does not dispute that *Anderson* stands for the proposition that an issue would evade review because "once a challenge is initiated, law enforcement will have every incentive to immediately file the documentation supporting the search, thereby mooting the particular claim," *Anderson*, 2006 UT 79, ¶ 11. That is, it supports the proposition for which we cite it: that we have recognized that a case may be likely to evade review because of a party's likely actions.

¶51 But, similar to its concern with *McBride*, the concurrence criticizes our reliance on *Anderson* because in that case we said that we could hear a "claim that, while technically moot, deserves review." *Id.* The concurrence sees the word "deserves" (italicized in its version, *infra* ¶ 109) as indicating that the *Anderson* court was treating mootness as a "matter of convenience" without due respect to justiciability. *Infra* ¶ 113. However, just like in *McBride*, the *Anderson* court applied the established three-pronged mootness exception and there is nothing to suggest the court deviated from it. *See Anderson*, 2006 UT 79, ¶¶ 11–12. We were not, as the concurrence suggests, just picking and choosing which cases we wanted to hear without regard to any legal standard. We stuck to the test.

¶52 The concurrence also dismisses *Anderson* because it believes that we could have decided the case on grounds other than mootness. *Infra* ¶¶ 110–111. According to the concurrence, we could have concluded that the case was not moot because Anderson asked

for relief beyond that which had been granted by the time his case was heard. *Infra* ¶ 110. That might be true, and is perhaps interesting as a historical factoid, but it does not speak to the precedential value of the analysis we employed. In other words, the concurrence would have us disregard what we said about mootness because if a party had raised the argument the concurrence identifies nearly fifteen years after we issued the opinion, we might not have had to consider whether the public interest exception applied to Anderson's case. But we did analyze whether the issue was moot, and, in the course of that analysis, we considered whether a party's actions were likely to cause the issue to avoid review.

¶53 Finally, the concurrence aims its fire at *Kearns-Tribune. Infra* ¶ 105. By way of reminder, we cited *Kearns-Tribune* favorably in both *State ex rel. C.D.* and *Utah Transit Authority* for the proposition "that a closed meeting in violation of the Public Meetings Act was a matter that would evade review because public officials were likely to publish the notes from the closed portion of the meeting before the matter was litigated." *State ex rel. C.D.*, 2010 UT 66, ¶ 14; *Utah Transit Auth.*, 2012 UT 75, ¶ 37 n.21.

¶54 Despite this favorable treatment, the concurrence finds our reliance on *Kearns-Tribune* "problematic" because the issue in *Kearns-Tribune* had been ruled on by the district court. *Infra* ¶ 107. According to the concurrence, *Utah Transit Authority* "establishes" that a party that receives a district court ruling cannot argue that the issue is likely to evade review. *Infra* ¶ 107. *Utah Transit Authority* did not speak to the question so definitively as to establish a hard and fast rule. *See* 2012 UT 75, ¶ 38. Rather, it was just one of the facts we relied on to conclude that the issue was not likely to evade review. *See id.*

¶55 Indeed, the sum total of our discussion of this new "rule" consists of: "Moreover, the parties actually obtained a judgment from the district court, indicating that this is not one of those discrete issues that will most often be resolved before a court can address the conflict." *Id.* At no point did we describe this as a rule or a conclusive factor. Nor could we have without dealing with prior cases in which we recognized a mootness exception where the issue became moot after the lower court had ruled, but before an appellate decision. *See, e.g., Ellis*, 2000 UT 101, ¶ 27 (applying this mootness exception to an election dispute after a district court ruled on the issue).

¶56 The concurrence's attempt to bury our case law while it is still alive is unavailing. No one has asked us to overturn it, and nothing that the concurrence levels at it convinces us that we should.

We respect *stare decisis* principles and stick with our case law.[13] As such, we continue to recognize — as we have several times before, — that it is possible for a party show that an issue is likely to evade

---

[13] The concurrence contends that we disregard principles of *stare decisis*. Our disagreement with the concurrence is not about *stare decisis* but about the meaning of the case law that *stare decisis* directs us to respect. The concurrence thinks our precedent says one thing. We think that case law says something different. We do not disagree that *stare decisis* respect should be given to our case law. We just disagree about what that case law says.

The concurrence also opines that we read the cases the way we do "all so [the majority] can cling to its view of mootness and judicial power." *Infra* ¶ 80 n.18. The concurrence doesn't cite anything for its assertion that the majority has a preferred view of mootness and judicial power. Presumably, the concurrence is thinking of a concurring opinion in *In re Gestational Agreement*, which one member of this majority wrote and another joined. 2019 UT 40, ¶¶ 56–98, 449 P.3d 69 (Pearce, J. concurring, joined by Himonas, J.). But that concurring opinion did not set forth a preferred "view of mootness and judicial power." The question there was whether the Utah Constitution mandated that the exercise of "judicial power required adversity between parties." *Id.* ¶ 60. The *Gestational Agreement* concurrence noted the lack of a "case or controversy" requirement in the Utah Constitution and pointed to a number of examples from the time of statehood where courts acted in cases that lacked adverse parties. *Id.* ¶ 63. Along the way, the *Gestational Agreement* concurrence expressed some concerns with the originalist analysis *Utah Transit Authority* employed to reach its conclusions about the meaning of the term "judicial power" in the Utah Constitution. *Id.* ¶¶ 88–92. That concurrence ultimately opined that it "appears that there is work to be done before we can be so definitive about the meaning of our constitution." *Id.* ¶ 93. So while that concurrence raised doubts about the originalist basis for the *Utah Transit Authority* court's conclusion about the scope of the judicial power, the "view" it expressed was that we need do the work necessary to ensure that we have accurately described what the people of Utah would have understood the term "judicial power" to mean when they adopted our state constitution. As described herein, our dispute with the concurrence is not over what the mootness exception should be, it is over what we have already said that exception is.

review because a party's likely future action will cause any one litigant to only be affected for a brief time. *See Steed*, 2015 UT 76, ¶ 7.

*C. Widdison Has Not Shown That This Issue
Is Likely to Evade Review*

¶57 Widdison offers a number of reasons why the issues she asks us to address are likely to evade review, but none of them are sufficient to meet her burden of persuasion.[14] *See State v. Black*, 2015 UT 54, ¶ 12, 355 P.3d 981 (suggesting the burden is on the party seeking the exception to show the elements of the exception).

¶58 Widdison first contends that the Board strategically paroled her in order to moot this case and avoid an adverse appellate decision with precedential effect. Beyond the timing of her parole, Widdison does not point to any information to suggest she was paroled specifically for the purpose of preventing this court from addressing the issues she raises. Nor does she offer anything to suggest that even if that were the case, it was part of a Board effort to systemically grant parole to keep those issues from this court.[15]

---

[14] As an initial matter, we note that Widdison did receive a ruling from the district court. In *Utah Transit Authority*, we concluded that the fact that "the parties actually obtained a judgment from the district court" indicated that "this is not one of those discrete issues that will most often be resolved before a court can address the conflict." 2012 UT 75, ¶ 38. Moreover, almost five years passed from the day Widdison filed her petition to the day her release from prison mooted the issue. Simply stated, this case has neither been brief nor entirely evaded review.

[15] The concurrence claims that our analysis of Widdison's argument "establish[es] . . . a new legal standard" for the mootness exception in considering whether "a specific defendant is systematically surrendering whenever a certain issue is appealed." *Infra* ¶ 125. The concurrence further complains that such an inquiry destroys the principles of justiciability. *Infra* ¶ 132. This misreads our decision.

We address the question of whether the Board is engaging in stratagem not because that is a new element of the test, but because it is the argument Widdison raises to meet the existing test. Widdison argues that the issue is likely to evade review because she believes that the Board is settling cases to avoid an adverse ruling. One should not conclude, as the concurrence does, that because this

(continued ...)

¶59 Second, Widdison argues that inmates face a number of hurdles if they want to place an issue before this court; primarily, they may lack experienced counsel to press the appeal. We recognize these difficulties. But we have noted that "the fact that the process is challenging does not mean that the issue is 'likely to evade review.'" *Poulton*, 2016 UT 9, ¶ 7. Widdison carries a burden of convincing this court that the hurdles she notes are likely to prevent us from having another opportunity to address the issues she raises. She does not connect these dots, and indeed, her argument runs contrary to this court's experience. Despite the very real difficulties inmates may have to confront, we routinely are presented with appeals and petitions that inmates file with the assistance of counsel.

¶60 Third, Widdison has not shown that historically these cases fail to be reviewed. This would help establish that the issue at hand is likely to continue to evade review. But, to the contrary, both we and the court of appeals continue to have cases on our dockets that address the type of questions Widdison wants to place before us. *See, e.g.*, *Neese*, 2017 UT 89 (addressing due process claims relating to Board hearings); *Blanke v. Bd. of Pardons & Parole*, 2020 UT 39, 467 P.3d 850 (same); *Brechlin v. Bd. of Pardons & Parole*, 2017 UT App 121, 402 P.3d 14 (same); *Harmon v. Bd. of Pardons & Parole*, 2017 UT App 115, 402 P.3d 1 (same); *Stewart v. Bd. of Pardons & Parole*, 2015 UT App 246, 360 P.3d 800 (same).

¶61 Finally, Widdison argues that the precise issue she raises has not been reviewed and is not likely to be reviewed because it relates to a rescission hearing. We fail to see anything distinctive about parole rescission hearings that would make these hearings more likely to evade review than other types of Board hearings. And Widdison does not give us any basis for that conclusion.

---

might be one way of demonstrating that an issue is likely to evade review, that it is a necessary part of the inquiry. *Cf. Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 (2020) (noting that the "recognition of the significance of [some] factors in [one] case [does] not mean that they must be met . . . in all other cases"). And our analysis of Widdison's arguments does not touch the question of whether mootness is a constitutional limitation. We are simply analyzing Widdison's arguments under the established test: whether the issue is likely to evade review because of the brief time any one litigant is affected.

¶62 Simply stated, Widdison has not demonstrated that this issue is likely to evade review. We would share Widdison's concern if it appeared that the Board was consistently paroling inmates in order to avoid review of its practices. And it is conceivable that a future litigant could show a pattern that would mark these issues as likely to evade review. But Widdison has not made that showing here.

¶63 Recognizing the high standard the third factor imposes, Widdison invites this court to "extend the public interest exception to include those cases . . . [where] the evading review is caused by or controlled by a respondent to avoid an adverse appellate decision." She also asks us to enlarge the exception to cover "whenever an inmate petitioner . . . brings claims of arbitrary and capricious acts by the Board."

¶64 As to the first invitation, as discussed above, Utah case law already recognizes that a party's likely actions may cause an issue to evade review. Widdison has simply not met her burden of demonstrating that the Board's actions make it unlikely that the issue will evade review.

¶65 As to the second, Widdison's argument could be read as asking us to disregard our requirement that the issue be likely to recur and recognize an exception to mootness based solely on the strength of the public interest the matter implicates. We have honed our exception over several decades and numerous cases. Widdison does not engage with the burden a party faces when she asks us to overturn our precedent. As a result, she fails to meet the burden associated with asking us to depart from *stare decisis* principles.

¶66 Widdison's argument could also be read as a request to expand our exception to any case where we could envision the matter arising again. We have rejected a similar argument. In *Utah Transit Authority*, we held that if we recognized an exception in "any of a broad range of garden-variety disputes, almost all of which *could* be resolved before the matter is resolved on appeal[,] . . . it would be the exception that swallowed the rule." 2012 UT 75, ¶ 39. We decline Widdison's invitation for the same reason.

## CONCLUSION

¶67 The Board granted Widdison the relief she asked this court to order. Her case is therefore moot. Widdison has not demonstrated that the public interest exception applies. We accordingly dismiss the appeal as moot and permit the district court's grant of summary judgment to stand.

ASSOCIATE CHIEF JUSTICE LEE, concurring in the judgment:

¶68 I concur in the majority's decision to dismiss this case as moot but write separately to register my disagreement with its substantial reformulation of our case law in this important field. The majority rightly deems the case moot on the ground that the Parole Board awarded appellant Widdison all the relief that her lawsuit sought to advance—early release from prison on parole. This is a classic mooting event. When a defendant accedes to a plaintiff's demands and confers the relief sought in her complaint, the case is moot because the court's decision can no longer affect the parties' interests in the case. The majority agrees. In explaining why the case is moot, however, the court repudiates our recent precedent and overrides the clarification it has offered.

¶69 As an initial matter, the court correctly states the elements of the established exception to the rule requiring dismissal of moot controversies. It says that "we will decide a moot issue when a litigant can demonstrate that the issue will '(1) affect the public interest, (2) be likely to recur, and (3) because of the brief time that any one litigant is affected, be likely to evade review.'" *Supra* ¶ 14 (quoting *State v. Steed*, 2015 UT 76, ¶ 7, 357 P.3d 547). The court breaks new and problematic ground, however, in describing the third element of the test. Citing a few of our older cases, the majority claims that issues can evade review not just "because of the intrinsic temporary nature of the issues presented," *supra* ¶ 24, but also "because of the likely actions of a party," *supra* ¶ 20 (citing *Kearns-Tribune Corp. v. Salt Lake Cnty. Comm'n*, 2001 UT 55, 28 P.3d 686; *Anderson v. Taylor*, 2006 UT 79, 149 P.3d 352; and *McBride v. State Bar*, 2010 UT 60, 242 P.3d 769).

¶70 This is not our law. Our exception[16] to the mootness doctrine is implicated only in those cases involving an *issue* that by

---

[16] The parties and the majority refer to this as the "'public interest' exception"—though even the majority views this formulation as more confusing than helpful. *See supra* ¶ 14; *see also Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 33, 289 P.3d 582 (calling "[t]his label . . . more confusing than helpful, as it implies some controlling significance in the public interest in the question presented for review," and resolving, "going forward," to "refer simply to the notion of an 'exception' to the mootness doctrine").

its *nature* is so rapidly resolving that it is likely to evade review. *See Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 37, 289 P.3d 582. Granted, we have also recognized that the strategic, voluntary acts of a defendant can justify judicial consideration of a case that may *appear* to be moot. But we have articulated separate standards for this sort of showing. And we have clarified that satisfaction of these standards doesn't sustain the above-noted exception—it establishes that the case is *not moot* under the doctrine of voluntary cessation. *See Teamsters Local 222 v. Utah Transit Auth.*, 2018 UT 33, ¶¶ 16–17, 424 P.2d 892.

¶71 Admittedly, our older cases are not a model of clarity. But much of the confusion and imprecision is a relic of an era in which we sometimes treated mootness as a mere "matter of convenience" that we could redefine or avoid as a matter of "judicial discretion"—in ruling on moot cases merely because we thought they "affect[ed] the public interest." *Utah Transit Auth.*, 2012 UT 75, ¶¶ 27, 30, 31, 31 n.18 (acknowledging but expressly repudiating that view and overruling past decisions that embraced it). In that era, we concededly handed down a few opinions that were only lightly theorized, and not always easy to reconcile with our more recent refinements. And these refinements have occasionally stretched to reconcile our holdings with older decisions.[17]

¶72 What is clear, however, is that the framework of our recent decisions is incompatible with the approach established by the majority today. Our decisions in *Utah Transit Authority*, *Teamsters*, and others, which we should follow as a matter of *stare decisis*, expressly reject specific tenets of the majority opinion. They make clear that the "likely" or "strategic" actions of a party do not create an alternative path to satisfying the third prong of our mootness exception, but rather implicate the doctrine of voluntary cessation. They also emphasize that in such circumstances, the relevant

---

[17] *See State v. Steed*, 2015 UT 76, ¶¶ 11, 11 n.9, 357 P.3d 547 (asserting that while we had "traditionally focused on whether the issue itself was of a rapidly resolving nature . . . and not on whether the issue is likely to evade review by virtue of collateral choices future parties are likely to make," we had "departed from our traditional approach" in *McBride v. State Bar*, 2010 UT 60, 242 P.3d 769); *Utah Transit Auth.*, 2012 UT 75, ¶ 37, 37 n.22 (claiming that *McBride* had established that bar admissions were an example of a "rapidly resolving issue[]").

controversy is the specific dispute between the current parties at the time we decide the case, not the issue generally in the abstract. And they demonstrate that it is the *defendant*'s behavior that might be impermissibly strategic—not the plaintiff's. To the extent the framing or language of our older and less-theorized case law is inconsistent with these principles laid out in *Utah Transit Authority*, *Teamsters*, and others, the older cases should be deemed to have been overtaken by more recent authority.

¶73 But the majority does the opposite. It overrides our clearer and more recent decisions by giving the broadest possible reading to our older, vaguer case law. In so doing the court establishes an exception to mootness that swallows the rule and creates two contradictory lines of precedent. It suggests that a plaintiff seeking to show that an issue is "likely to evade review" can do so by producing evidence that the defendant has acted "specifically for the purpose of preventing this court from addressing the issues she raises." *See supra* ¶ 58.

¶74 This is a troubling intimation. Even if Widdison *had* "convinced us that if we do not decide her case, we will likely deprive ourselves of any opportunity to review the types of issues she raises," *supra* ¶ 3, that would not have established our jurisdiction. Our exception to mootness is limited to those "rapidly resolving issues" that are "*inherently* short in duration," as a result of something other than "the parties' actions." *Utah Transit Auth.*, 2012 UT 75, ¶¶ 37–38 (emphasis added) (citation omitted) (internal quotation marks omitted). This is because jurisdiction is not a function of whether "the question presented is sufficiently important or interesting to merit our attention and to justify the clarification of Utah law through publication of an opinion." *Id.* ¶ 17. Rather, it is a matter circumscribed by our "judicial power" to "hear and determine controversies between adverse parties." *Carlton v. Brown*, 2014 UT 6, ¶ 29, 323 P.3d 571 (citation omitted) (internal quotation marks omitted). The notion that we would come to a different justiciability determination if we believed a defendant to be acting "systemically" to "keep [an] issue[] from this court," *supra* ¶ 58, or to "deprive" us of an opportunity to review a specific issue, *supra* ¶ 3, sounds in the discretionary theory of mootness that we forcefully repudiated in *Utah Transit Authority. See* 2012 UT 75, ¶¶ 19–27. In deciding the case on these grounds, the majority effectively overrules a substantial body of our recent case law and establishes a newly minted standard that lacks support in any prior decision.

A.C.J. LEE, concurring in the judgment

¶75 I elaborate on my concerns below. First, I highlight holdings in *Utah Transit Authority*, *Teamsters*, and other decisions that are ignored or overridden by the majority opinion. Then I address the cases the court cites in support of its contrary approach, showing that they mostly do not support the majority's holding and have been overtaken by more recent decisions to the extent they do. And I close with some observations about the doctrine of *stare decisis* and its implications for our decision in this case.

## I. Utah Transit Authority and Teamsters

¶76 The majority opinion holds squarely for the first time that a case can be deemed likely to evade review "because of the likely actions of a party." *Supra* ¶ 20. In so doing it eviscerates *Utah Transit Authority v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, 289 P.3d 582, and its explicit cabining of our mootness exception. It also subverts our holding in *Teamsters Local 222 v. Utah Transit Authority*, 2018 UT 33, 424 P.3d 892 by (1) establishing an expanded definition of "likely to evade review" that is immune to ripeness concerns and separate and distinct from the doctrine of voluntary cessation, and (2) redefining both the relevant "controversy" and "likely actions of a party."

### A. *Utah Transit Authority*

¶77 In *Utah Transit Authority*, we redefined and limited the judicial exception to the mootness rule in Utah. We began by noting that our case law had "long endorsed" the position that "[m]ootness is a constitutional principle" that speaks to limits on our "judicial power" under article VIII of the Utah Constitution. *Utah Transit Auth.*, 2012 UT 75, ¶¶ 18–20, 27.[18] We rejected the parties' invitation to treat the mootness doctrine as a mere "matter of convenience" that Utah courts may redefine or avoid as a matter of "judicial discretion." *Id.* ¶¶ 16, 25, 27, 33. And we established specific elements that must be established for a court to exercise jurisdiction over a case that has become moot—a showing that the issue in question "(1) . . . affects the public interest, (2) is likely to recur, and (3) because of the brief time that any one litigant is affected, evades review." *Id.* ¶ 32.

---

[18] *See also In re Gestational Agreement*, 2019 UT 40, ¶ 12, 449 P.3d 69 ("'[J]udicial power' in Utah has traditionally been limited to the adjudication of disputes, and *where no dispute* between opposing parties *exists*, the court is without jurisdiction." (emphasis added)).

¶78  We also clarified the third element of our test. We stated that this last prong focuses on the *nature* of the question presented, requiring a showing that *the issue* is "so discrete or rapidly resolving" that it evades review. *Id.* ¶ 37. And we explained that "[t]he types of issues likely to evade review are those that are inherently short in duration so that by the time the issue is appealed, a court is no longer in a position to provide a remedy." *Id.* (citation omitted)(internal quotation marks omitted). In dismissing the dispute in *Utah Transit Authority* (an attempt to compel arbitration under an old collective bargaining agreement after the negotiation of a new one), moreover, we held that the exception is triggered only for "matter[s] of '*inherently* short' duration." *Id.* ¶ 38 (emphasis added).

¶79  The majority concedes these points. But it claims that we never disavowed earlier cases that seemed to "allow[] a party to argue that an issue is likely to evade review because of another party's actions." *Supra* ¶ 30. The court reaches that conclusion on the ground that we never specifically "opine[d]" on the earlier cases. *Supra* ¶ 29. Because *Utah Transit Authority* cited *McBride v. State Bar*, 2010 UT 60, 242 P.3d 769, and *Kearns-Tribune Corp. v. Salt Lake County Commission*, 2001 UT 55, 28 P.3d 686, favorably in footnotes, the majority also concludes that *Utah Transit Authority* couldn't have cabined those decisions. *See supra* ¶ 27 n.7.

¶80  I don't follow. In *Utah Transit Authority*, we expressly clarified that it is not enough to show that a dispute has been resolved as "*a function of the parties' actions*." 2012 UT 75, ¶ 38 (emphasis added). And we held that because "the parties [had] actually obtained a judgment from the district court" on their dispute, the question of arbitrability was "not one of those discrete issues that will most often be resolved before a court can address the conflict."[19] *Id.* Sure, we "never said," that we were overruling any

---

[19] The majority claims that the above-quoted language is actually "not what we said" in *Utah Transit Authority*, *supra* ¶ 33—that I am somehow "misstat[ing]" or "rewording," *supra* ¶¶ 31 n.8, 32, our holding in that case. But the majority cannot erase our reasoning in *Utah Transit Authority* just because it does not like it. Nor can it do so because it prefers the reasoning of the cases *Utah Transit Authority* cited in summarizing our case law. Yes, in *Utah Transit Authority* we listed several areas in which we had found an exception to mootness. 2012 UT 75, ¶ 37. And in footnote parentheticals, we implicitly
(continued ...)

and all holdings inconsistent with our latest decision. *Supra* ¶ 30, But that is of no moment. The controlling, undisputed point is this: We *held* that the situation in *Utah Transit Authority* was "not some matter of 'inherently short' duration" because the situation was resolved as "a function of the parties' actions."[20] 2012 UT 75, ¶ 38. That is the

recognized that a few of those issues had qualified for the exception to mootness based on the actions of the parties. *Id.* ¶ 37 & nn.21–22. But in the body of the opinion *where we explained our holding*, we squarely characterized these cases as "types of issues likely to evade review" because they were "rapidly resolving issues" of "*inherently short . . . duration.*" *Id.* ¶ 37 (emphasis added) (citation omitted) (internal quotation marks omitted). And we immediately went on to hold that the issue in *Utah Transit Authority* was "*not* of that ilk," because the controversy had been mooted as "a function of the parties' actions" rather than because it was "some matter of 'inherently short' duration." *Id.* ¶ 38 (emphasis added).

At the end of the day, the majority is trying to elevate short footnote parentheticals over the actual reasons we gave for our decision in *Utah Transit Authority. See supra* ¶ 54–55 (claiming that the *second* reason we gave for our holding—that the fact the parties had "'actually obtained a judgment from the district court,'" (quoting *Utah Transit Auth.*, 2012 UT 75, ¶ 38) indicating it was "'not one of those discrete issues that will most often be resolved before a court can address the conflict,'" (quoting *Utah Transit Auth.*, 2012 UT 75, ¶ 38) "did not speak to the question so definitively as to establish a hard and fast rule") The majority is thus diminishing or outright rejecting the only two reasons we gave for our holding in *Utah Transit Authority*—all so it can cling to its view of mootness and judicial power.

[20] The majority suggests that I am "rewording our *Utah Transit Authority* holding, . . . taking a three-word phrase, 'the parties' actions,' and suggesting that our description of the mootness exception included this limitation." *Supra* ¶ 32. But the majority misreads *Utah Transit Authority*. In that case we first defined matters capable of evading review as those sufficiently and "inherently short in duration." *Utah Transit Authority*, 2012 UT 75, ¶ 37–38 (citing *In re Adoption of L.O.*, 2012 UT 23, ¶ 10, 282 P.3d 977) (internal quotation marks omitted). We then described disputes resolved by "the parties' actions" as matters *not* resolved due to the matters' inherently short duration:

(continued ...)

controlling precedent on the matter.[21] And the effective sweep of that holding doesn't depend on whether we drafted a blacklist of every prior inconsistent holding, or correctly believed that older

---

> [T]he parties [have not] shown that the matter is so discrete or rapidly resolving as to be "capable of evading review." . . . The matter before us is not of that ilk. Although the negotiations in *this* case resolved the dispute before an appeal could be fully developed and decided, that result is a function of the parties' actions in light of an arbitration ruling, not some matter of "inherently short" duration.

*Utah Transit Auth.*, 2012 UT 75, ¶ 37–38. If a matter is resolved due to "the parties' actions," then *Utah Transit Authority* explains that the matter was not resolved due to its inherently short duration. A matter resolved due to the parties' actions therefore does not fall within the mootness exception. So it follows that *Utah Transit Authority* limits the mootness exception to exclude disputes resolved by "the parties' actions."

[21] According the majority, "[o]ur one-sentence discussion of 'the parties' actions' analyzed the specific facts *Utah Transit Authority* presented. We stated that the parties 'in *this* case' resolved their dispute and the case was mooted as 'a function of the parties' actions in light of an arbitration ruling.' This was case specific analysis; our application of our test to the facts presented." *Supra* ¶ 35 (citing *Utah Trans. Authority*, 2012 UT 75, ¶ 38). The majority implies that this application was therefore not a "reason[] for our decision" and thus lacks precedential value. *Supra* ¶ 33. But that's not how *stare decisis* works. Precedent would serve little purpose if it simply meant restating the same rules and applying them in new ways. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 21, 345 P.3d 553 ("Stare decisis is a cornerstone of Anglo–American jurisprudence because it is crucial to the predictability of the law and the fairness of adjudication.") (citation omitted) (internal quotation marks omitted). *Stare decisis* applies to any and all reasoning necessary for resolving a case. *See* Michael Abramowicz and Maxwell Stearns, *Defining Dicta*, 57 STAN. L. REV. 953, 968 (2005) ("A legal system that does not count decided propositions that are necessary to the disposition as holdings is effectively a legal system without holdings."). Under this view, it is beside the point whether *Utah Transit Authority* stated the relevant principle when describing the doctrine or when applying it.

cases were reconcilable with our more recent articulation of the law. *See* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 300 (2016) ("A court of last resort generally follows its decision in the most recent case, which *must have* tacitly overruled any truly inconsistent holding." (emphasis added)); *Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989), *superseded by statute on other grounds*, (noting that when "the growth of judicial doctrine" or "subsequent changes or development in the law" have "removed or weakened the conceptual underpinnings from [a] prior decision," or "later law has rendered [a] decision irreconcilable with competing legal doctrines or policies," the Court "has not hesitated" to overrule it).

¶81 To suggest otherwise is to say that any holding we lack the foresight to identify, scrutinize, and dismiss today remains good law—no matter how inconsistent it is with the principles we now set forth. That's not how *stare decisis* works.

¶82 The point can be illustrated by reference to some (in)famous precedent from the United States Supreme Court. *Korematsu v. United States*, 323 U.S. 214 (1944) was the first case to articulate a strict-scrutiny standard of review for government action that discriminates on the basis of race or ethnicity. *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 316 (2013) (Scalia, J., concurring) (explaining that "[t]he Court first articulated the strict-scrutiny standard in *Korematsu v. United States*"). Since then, the Court has applied this standard numerous times. *See, e.g.*, *Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny."). Yet nobody would suggest that the Court's post-*Korematsu* strict-scrutiny case law allowed for the government "internment" of 70,000 American citizens of Japanese descent right up until the Court expressly overruled *Korematsu* in *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018). *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215 (1995) (describing the Court's failure to faithfully apply strict scrutiny in *Korematsu* as "inexplicabl[e]"); *id.* at 236 ("*Korematsu* demonstrates vividly that even 'the most rigid scrutiny' can sometimes fail to detect an illegitimate racial classification."). By the time the Court decided *Trump v. Hawaii*, it was so apparent that this holding of *Korematsu* had been abandoned that the Court felt comfortable using a case it believed "ha[d] nothing to do with" *Korematsu* to "make express what [was] already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be

clear—has no place in law under the Constitution." 138 S. Ct. at 2423 (citation omitted) (internal quotation marks omitted).

¶83 The fact that a court may believe its older precedents are reconcilable with a recent holding likewise does not prevent that court from later acknowledging that the older precedents were always irreconcilable.[22] A good example is *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), wherein the Court believed it was possible to reconcile the rule of *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753 (1967)—that a business must have a "physical presence" in a state before it may be forced to collect and remit sales and use taxes for that state—with its modern Commerce Clause jurisprudence. *Quill*, 504 U.S. at 310–18. This was despite the fact that the Court's jurisprudence had rejected the distinction between "direct" and "indirect" taxes on interstate commerce, *id.* at 310 (citation omitted) (internal quotation marks omitted), and sustained other taxes on the ground that the targeted activity had a "substantial nexus" with the state in question, *id.* at 311. The Court finally acknowledged in *South Dakota v. Wayfair, Inc.* that *Quill* was "flawed on its own terms" and that "the physical presence rule, both as first formulated and as applied today, is an incorrect interpretation of the Commerce Clause." 138 S. Ct. 2080, 2092 (2018). It did not matter that the court had "continue[d] to cite *Bellas Hess*

---

[22] The majority argues that "we had the chance to acknowledge this supposed 'mistake' in *Steed*," but "instead . . . did the complete opposite," "expressly reject[ing that] our case law allows a party to show that an issue is likely to evade review because of a party's actions." *Supra* ¶ 42. But *Steed* acknowledged that *McBride* was a "depart[ure]" from our "traditional approach." *State v. Steed*, 2015 UT 76, ¶ 11 n. 9, 357 P.3d 547. And it declined to overrule *McBride* because it was not necessary to resolve the case at hand. *See id.* (resolving the case based on the "rapidly resolving nature of the issue itself and not on the likely choices of future litigants"). In any case, because the mere fact that we at one point failed to correct our misapprehension about the reconcilability of our precedents does not mean that we are precluded from doing so in the future. As I explain, in *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), the United States Supreme Court refused to acknowledge the tension between *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753 (1967), and its other Commerce Clause jurisprudence. And that did not prevent it from setting the record straight in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2092 (2018).

with approval" for decades alongside its other Commerce Clause jurisprudence. *Quill*, 504 U.S. at 311. The Court nonetheless concluded that *Bellas Hess* was irreconcilable with clearer and more recent precedent. *See Wayfair*, 138 S. Ct. at 2092–96; *but see supra* ¶ 31 (asserting that *Utah Transit Authority* couldn't have cabined *McBride* or *Kearns-Tribune* because it "blessed" them in cursory footnotes).

¶84 Despite the majority's protestations to the contrary, the court today overrides important tenets of our *Utah Transit Authority* decision. Instead of applying the clear holding of that case, it cites several pre-*Utah Transit Authority* cases for the proposition that "issues can evade review because of the likely actions of a party." *Supra* ¶ 20–24 (citing *Kearns-Tribune*, 2001 UT 55; *Anderson*, 2006 UT 79; and *McBride*, 2010 UT 60).

¶85 As noted below, there are reasons to doubt that these cases ever stood for all that the majority claims they do. *See infra* Part II. But even if they did, resurrecting *Kearns-Tribune*, *Anderson*, and *McBride* in this way clearly overrides *Utah Transit Authority*'s explicit limitation of the "likely to evade review" prong to cases involving "issues" that are "so discrete and rapidly resolving" that they likely evade judicial decision.[23] The majority's revival of *Kearns-Tribune* is especially troubling. The court's reading of this case overrides *Utah Transit Authority*'s holding that the fact a district court has ruled on an issue is strong evidence that a case does not involve the kind of "discrete issue[]" that satisfies the exception to the mootness rule. 2012 UT 75, ¶ 38; *see Kearns-Tribune*, 2001 UT 55, ¶ 1 (noting that the district court had ruled in favor of Kearns-Tribune). And this last move is made more ironic by the majority's invocation of *Utah Transit Authority* in rejecting Widdison's challenge. *See supra* ¶ 57 n.14 (acknowledging that Widdison received a ruling from the district court and noting that *Utah Transit Authority* "concluded that the fact that 'the parties actually obtained a judgment from the district court' indicated that 'this is not one of those discrete issues that will most often be resolved before a court can address the conflict'" (citation omitted)).

---

[23] The majority claims that *Utah Transit Authority* both "did not address . . . head on" its alternative likely-to-evade-review prong and "referenced *McBride* and *Kearns-Tribune*" on this point. *See supra* ¶ 27. But "[t]hat's a weird way for us to [reaffirm] something." *See supra* ¶ 31.

### B. *Teamsters*

¶86 The problems with the majority opinion are thrown into sharper relief by our more recent mootness and ripeness decision in *Teamsters*. There, we dismissed as moot a case in which the Teamsters Union asserted a legal right to organize a group of supervisors who had already voted not to unionize. 2018 UT 33, ¶ 1. In so doing, we reiterated the framework of our opinion in *Utah Transit Authority*—holding that it is our "duty" to dismiss a moot controversy "even if the issue is 'important [or] might speculatively resurface as a point of dispute between the parties in the future.'" *Id*. ¶ 9 (alteration in original) (citation omitted) (internal quotation marks omitted).

¶87 We also elaborated on our doctrine of voluntary cessation—the principle that a case that may appear to be moot is not moot if the defendant has not truly ceased the challenged conduct directed at the specific plaintiff. *See id.* ¶¶ 16–17. We explained that in such a circumstance, the controversy remains live and we may review the case. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct . . . does not make the case moot.").

¶88 *Teamsters* thus establishes the proper framework for evaluating cases allegedly mooted by the "likely actions of a party" (for strategic litigation purposes, for example). In *Teamsters*, the parties made no assertion that the issue presented was a matter of such "inherently short duration" that it evaded review. And rightly so, as *Utah Transit Authority* had made clear that the voluntary actions of a party have no bearing on the third prong of the mootness exception. 2012 UT 75, ¶ 38. We likewise did not raise the above-noted exception to mootness *sua sponte* or otherwise discuss the case in those terms. Instead, we rejected the appellant's request that we consider the appeal by discussing voluntary cessation and making two important clarifications to that doctrine—clarifications that the majority fails to even acknowledge in reaffirming its reading of *McBride*, *Kearns-Tribune*, and *Anderson*.

### 1. Proper Definition of the Controversy

¶89 *Teamsters* first explained the relationship between mootness and ripeness and held that courts should define the scope of the relevant "controversy" allegedly mooted by a party's actions as the specific action taken against the instant party at the time the court rules on the case.

¶90 In *Teamsters*, the appellant argued that the case was not moot because "the supervisors could attempt to unionize again in the future." 2018 UT 33, ¶ 12. We rejected this argument "because it [was] based on a misconception of the nature of the controversy at issue." *Id.* ¶ 13. "The relevant controversy," we explained, "is not whether the supervisors have some general right to unionize; it is whether these supervisors have a right to unionize in this instance." *Id.* "And since the supervisors [had] indicated their desire to remain unorganized for the time being," we held that "our decision could not affect th[o]se supervisors *at* th[at] *time*." *Id.* In other words, the appellant "want[ed] us to decide th[e] case to avert a future case." *Id.* ¶ 14. But we emphasized that "such a decision would run afoul of the doctrine of ripeness," since *that* "controversy" would "involve[] a 'hypothetical' future date on which the supervisors could conceivably seek to unionize again." *Id.* ¶¶ 14–15; *see also Salt Lake County v. State*, 2020 UT 27, ¶ 2, 466 P.3d 158 ("Under our ripeness doctrine, courts should resolve legal issues only where the resulting legal rule can be applied to a *specific* set of facts, thereby resolving a *specific* controversy." (emphasis added)); *id.* ¶ 3 ("[W]e have no power to decide abstract questions . . . in the absence of an actual controversy directly involving rights.") (citation omitted) (internal quotation marks omitted); *id.* ¶ 47 ("[O]ur case law has firmly established that courts should not render advisory opinions, or, in other words, answer abstract questions.").

¶91 *Teamsters* thus frames the mootness inquiry in terms that foreclose the sweeping standard endorsed by the majority. Because the Parole Board has already given Widdison the relief she is seeking, the case is moot because our decision cannot affect *this* inmate in *this instance* at *this time*. *See Teamsters*, 2018 UT 33, ¶ 13. And that determination of mootness holds notwithstanding the hypothetical possibility that Widdison (let alone others) could benefit from our decision in a "future case." *Id.* ¶ 14.

¶92 For that same reason, future cases involving already-paroled inmates will also be moot.[24] And any attempt to allow an already-paroled inmate to invoke an exception to the mootness doctrine will implicate ripeness concerns. The majority suggests that Widdison or another litigant might be able to invoke our exception

---

[24] Unless, of course, future litigants are able to show that they suffer collateral legal consequences. *See State v. Legg*, 2018 UT 12, ¶¶ 17, 25, 33, 417 P.3d 592.

to mootness in the future by showing that she was "paroled specifically for the purpose of preventing this court from addressing the issues she raises" as "part of a[n] . . . effort to systemically grant parole to keep those issues from this court." *Supra* ¶ 58. But in that future case, the question will not be whether inmates in general "have some general right" to the procedures Widdison seeks in her own suit against the Parole Board. *See Teamsters*, 2018 UT 33, ¶ 13; *see also Salt Lake County*, 2020 UT 27, ¶ 20 ("[W]here there exists no more than a difference of opinion regarding the hypothetical application of [the law] to a situation in which the parties might, at some future time, find themselves, the question is unripe for adjudication." (citation omitted) (internal quotation marks omitted)). It will still be whether *that* inmate has such rights "in *[that]* instance" "at *[that]* time." *See Teamsters*, 2018 UT 33, ¶ 13 (first emphasis added). In other words, that future case will still be moot if the inmate has already been paroled, for the same reasons Widdison's case is moot today—notwithstanding any success in demonstrating a general strategic pattern of behavior.[25]

---

[25] The majority contends that "[i]f the concurrence reads *Teamsters* correctly, then *Teamsters* overruled *sub silentio* every variant of the mootness exception—even the one we all agree *Utah Transit Authority* recognized and preserved—because every variant of that exception to mootness would implicate ripeness concerns." *Supra* ¶ 44, n.11. This is incorrect. The mootness exception does create ripeness concerns—it allows courts to declare rules for hypothetical controversies that share facts with a resolved dispute. *See Teamsters*, 2018 UT 33, ¶ 15 ("A case is unripe where 'there exists no more than a difference of opinion regarding the hypothetical application of a piece of legislation to a situation' . . . . [After] a controversy [is] mooted . . . any remaining conflict is simply unripe, in that it involves a 'hypothetical' future [dispute]." (citation omitted)). But that does not preclude the mootness doctrine from having exemptions, *see supra* ¶ 24 n.5 (discussing the voluntary cessation doctrine as a live controversy), and exceptions, *see supra* ¶ 14 (explaining the traditional mootness exception); *see also Steed*, 2015 UT 76, ¶ 18 (Lee, A.C.J., concurring) ("The traditional exception—for matters capable of repetition but evading review—. . . has been accepted for many decades in a long line of cases. I would accept that exception on *stare decisis* grounds.") (footnote omitted). The mootness exception simply implies a corollary ripeness exception—allowing courts to resolve a future, hypothetical case that

(continued ...)

### 2. Impact of Defendants' Voluntary Actions

¶93 After discussing how to define the relevant "controversy" under our mootness and ripeness doctrines, *Teamsters* made clear that voluntary cessation is not implicated by the "likely actions" of just *any* party, but by the voluntary actions of *defendants*.

¶94 After the supervisors in *Teamsters* "voluntarily" ceased engaging in the activity that gave rise to the dispute, the appellant asserted that the court should consider the case in light of the allegedly "strategic litigation purpose" of that cessation. *Id.* ¶ 16. We addressed this argument under a line of cases viewing "mootness arguments with suspicion when the party claiming mootness may have ceased its activity for a strategic litigation purpose." *Id.* And we concluded that the appellant had failed to establish this basis for avoiding the mootness rule. *Id.* ¶ 18. "The classic voluntary cessation case," we noted, "involves a defendant who is charged with violating a plaintiff's legal rights and who stops just long enough to get the action dismissed." *Id.* ¶ 17. This doctrine, in other words, is "concerned with the prospect of [a] defendant remaining free to resume its allegedly unlawful behavior" and "being able to repeat the process whenever the plaintiff reasserts its legal rights." *Id.* And we held that this doctrine was not implicated in the *Teamsters* case: "The supervisors were not *defendants* who sought to moot a case when they were sued for violating a plaintiff's legal rights. They were *plaintiffs* seeking to establish their own legal rights." *Id.* ¶ 18 (emphasis added). We thus held that "the strategic pattern contemplated in the voluntary cessation line of cases [was] not implicated." *Id.* Because we had "no reason to doubt the sincerity of the supervisors' decision to repudiate their initial inclination to organize as a union," we found that they were "unlikely to have been influenced by any strategic attempt to evade judicial review." *Id.* ¶ 19. And we accordingly rejected the appellant's invitation to resolve the case on the merits.

¶95 This clarification further forecloses the majority's approach. The majority views *McBride* as standing for the proposition that we can find an exception to our mootness rule based on the likely

_____

shares identical facts with the mooted controversy. For that reason, courts applying the mootness exception resolve "issues," not disputes. *See, e.g.*, *McBride*, 2010 UT 60, ¶ 15 (in applying the mootness exception, repeatedly describing the court's role as an opportunity to "address the issues").

actions of any party, including the plaintiff. *See supra* ¶ 20–22. In particular, it claims that *McBride* found an exception on the ground that "the [bar] exam was held every six months and the petitioning applicant could just retake the exam" before we had a chance to review the case. *Supra* ¶ 21. But under *Teamsters*, a *plaintiff*'s voluntary acts are never grounds for ruling on a moot case because no strategic litigation purpose is served by a plaintiff ending his own controversy. 2018 UT 33, ¶¶ 16, 18–19.

### 3. *Teamsters* Governs the Issue Presented

¶96 In discussing our mootness exception, the majority acknowledges this court's recognition of the "parallel notion" of voluntary cessation in *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 42, 364 P.3d 103. *See supra* ¶ 24 n.5. It even identifies reasons why Widdison should lose under that doctrine. *See supra* ¶ 24 n.5. But it goes on to claim that the principle of voluntary cessation is under-developed in our case law and concludes that it is somehow not relevant to our disposition of this case because Widdison failed to frame her challenge in these terms. *See supra* ¶ 24 n.5.

¶97 I disagree on both counts. The doctrine is well-developed in our case law, as I explain above. *See supra* ¶¶ 93–95 (citing *Teamsters Local 222 v. Utah Transit Auth.*, 2018 UT 33, ¶¶ 16–19, 424 P.2d 892). And our legal analysis is not limited to the framing presented by Widdison in her briefing. *See McDonald v. Fid. & Deposit Co. of Maryland*, 2020 UT 11, ¶ 33, 462 P.3d 343 (holding that "we are not limited" to the parties' framing of the law on issues presented for our review given that it is our "duty to say what the law is"—and ultimately to "get the law right"); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

¶98 The majority nonetheless seeks to sidestep *Teamsters* on the ground that it "did not opine" on the mootness exception, *supra* ¶ 27, and "said nothing" specifically about its cited likely-to-evade-review cases, *supra* ¶ 44. In fact it asserts not only that *Teamsters* "did not address the relevant question," *supra* ¶ 44, but also that it "neither applied nor adopted the voluntary cessation doctrine," *supra* ¶ 44 n.12.

¶99 In sum, the majority is asserting that *Teamsters* isn't controlling here because (1) it didn't really accept the validity of the voluntary-cessation principles it discussed—it just found some

inapposite federal case law on the subject distinguishable; (2) it didn't "mention the case in which we had discussed the voluntary cessation doctrine: *InnoSys, Inc. v. Mercer,* 2015 UT 80," *supra* ¶ 44 n.12,—a case the majority contends shouldn't govern this situation anyway because it, in turn, did not cite our exception-to-mootness cases, *supra* ¶ 44 n.12; and (3) our "likely to evade review" case law "does not require that the issue be likely to recur between the same parties, but the voluntary cessation doctrine might," *supra* ¶ 44 n.12 (citation omitted).

¶100 With respect to the first argument, half the mootness analysis in *Teamsters* came before the court even acknowledged the employer's federal case law on voluntary cessation. That is, one of the many important holdings that the majority claims is not controlling in this case—the holding that tells us how this court must define the "relevant controversy" when determining whether a case is justiciable under our mootness *and* ripeness doctrines—was delivered before the court ever turned to consider whether the case was not in fact moot under the doctrine of voluntary cessation. *See Teamsters*, 2018 UT 33, ¶ 13 ("Th[e] [employer's] argument fails because it is based on a misconception of the nature of the controversy at issue. The relevant controversy is not whether the supervisors have some general right to unionize; it is whether these supervisors have a right to unionize in this instance. And since the supervisors have indicated their desire to remain unorganized for the time being, our decision could not affect *these* supervisors *at this time*."). So even if *Teamsters* discussed voluntary-cessation principles only for the sake of argument, as the majority suggests, its holding defining the "relevant controversy" for justiciability purposes is on point and thus fully controlling here.[26] The majority offers no basis for ignoring it.

_____

[26] The majority also claims that it is permitted to disregard *Teamsters* because it is conceding that this case is moot and is merely deciding "whether *an exception* to mootness applies." *Supra* ¶ 44 n.11. Yet the ultimate question is whether we have jurisdiction to hear the case. And the fact that the court believes one line of cases grants us jurisdiction even though another forbids it just shows how problematic the majority's approach is. *See infra* ¶¶ 103; 131.

*Teamsters*, moreover, held that properly defining the relevant controversy implicates both mootness *and* ripeness concerns. *See Teamsters*, 2018 UT 33, ¶¶ 13–14 ("The relevant controversy is not whether the supervisors have some general right to unionize; it is

(continued ...)

¶101   For similar reasons, I do not understand how the majority can denigrate *Teamsters* but cite *InnoSys* as authoritative. Like *Teamsters*, *InnoSys* only ever cited federal case law for support. 2015 UT 80, ¶¶ 42–43. Despite that fact, the majority has no difficulty recognizing *InnoSys* as precedent on Utah's doctrine of voluntary cessation. *Supra* ¶¶ 24 n.5, 44 n.12. I cannot see how *Teamsters* can be regarded as any less binding, when it began its mootness-ripeness discussion before ever turning to federal voluntary-cessation case law, and cited the same kinds of authorities relied on in *InnoSys*.

¶102   The second argument is related to the majority's argument for ignoring *Utah Transit Authority*'s clear holdings. In dismissing *Utah Transit Authority*, the majority claims that the reach of the court's holdings is limited because *Utah Transit Authority* did not expressly say it was overruling past inconsistent case law. *See supra* ¶ 30. Here, it claims that *Teamsters*'s holdings are not controlling because *Teamsters* failed to mention some other case that had previously touched on the same issue. *See supra* ¶ 44 n.11. Once

---

whether these supervisors have a right to unionize in this instance . . . . UTA wants us to decide this case to avert a future case—by opining that the supervisors have no legal right to unionize. But such a decision would run afoul of the doctrine of ripeness."); *see also Salt Lake County v. State*, 2020 UT 27, ¶ 2, 466 P.3d 158 ("Under our ripeness doctrine, courts should resolve legal issues only where the resulting legal rule can be applied to a *specific* set of facts, thereby resolving a *specific* controversy." (emphasis added)). With that in mind, the majority's proposed exception to mootness cannot properly avoid *Teamsters*'s *ripeness* holding.

The majority's suggestion that it can ignore *Teamsters*'s ripeness holding because Widdison has neither made a ripeness argument nor argued that our ripeness cases conflict with our mootness case law is puzzling. *Supra* ¶ 44 n.11. Jurisdiction is not an argument that can be waived or ignored by the parties. It is a limit on the judicial power. And we have a duty to resolve any existing tensions within our case law defining jurisdictional limits—not exacerbate them or create new ones. Today, the majority reintroduces a previously resolved tension between the likely-to-evade-review prong and our ripeness case law. And such a novel exercise of judicial power merits explanation. The court cannot properly ignore a jurisdictional defect under our case law and punt the issue because it does not want to deal with the messy consequences of its holding.

again, this court's precedents are not so weak that they lose force any time this court fails to call out a specific case. *See supra* ¶¶ 80–82. And again, it is not clear why the majority believes it significant that *Teamsters* failed to reference *InnoSys*, given that *InnoSys* also relied only on federal authority.

¶103   Finally, the majority suggests that it is not establishing two different tests for analyzing the same set of facts (as I contend below, *see infra* ¶ 131), because its likely-to-evade review prong "does not require that the issue be likely to recur between the same parties," but the voluntary cessation doctrine "might," *supra* ¶ 44 n.12. It's not very reassuring to hear that the court "might" not be establishing two different tests for analyzing the same situation. More importantly, there will be many situations in which a party *can* assert that the issue is likely to recur *vis-à-vis* the other party. In fact, that was precisely the situation in the *Teamsters* case. *See* 2018 UT 33, ¶ 11 (noting that the defendant (UTA) asked us to rule on its moot controversy with the plaintiffs (a group of supervisors) because the plaintiffs could "seek to unionize again in the future"). And in those situations, both tests—*Widdison* and *Teamsters*—will be implicated. The notion that the majority's approach will only *sometimes* allow courts to pick one justiciability test or the other is not any less problematic.[27]

---

[27] The majority also seeks to avoid this dual-track problem by claiming that "[t]o the extent there is tension between the voluntary cessation doctrine and the public interest exception, that is a problem *InnoSys*—and not our opinion—has created." *Supra* ¶ 44 n.12. And it acts as though I am asking the court to reach out and resolve this tension unnecessarily. *Supra* ¶ 44 n.12. This has it exactly backwards. There is only tension in our case law because the majority insists on resurrecting its outdated view of the likely-to-evade-review prong of our exception to mootness. If the majority were to embrace the mootness and ripeness principles laid out in *Utah Transit Authority*, *Teamsters*, and others, *there would be no tension* between our exception-to-mootness case law and our voluntary cessation case law.

Normally we take up cases in order to clarify the law and promote uniformity in its application. Today the majority does the opposite. It goes out of its way to inject new confusion into our law as it enhances the discretion of our courts—by allowing the likely actions of a defendant to be analyzed under either an

(continued ...)

## II. *Kearns-Tribune, Anderson, and McBride*

¶104   The majority claims to derive its formulation of the "likely to evade review" prong of our mootness exception from three principal decisions—*Kearns-Tribune Corp. v. Salt Lake County Commission*, 2001 UT 55, 28 P.3d 686; *Anderson v. Taylor*, 2006 UT 79, 149 P.3d 352; and *McBride v. State Bar*, 2010 UT 60, 242 P.3d 769. *See supra* ¶ 20–24. *Kearns-Tribune* does not clearly support the majority's new standard, however. And to the extent that it and *Anderson* and *McBride* contain language that *could* do so, their analysis has been overtaken by our more recent decisions in this field—namely, *Utah Transit Authority v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, 289 P.3d 582; *State v. Steed*, 2015 UT 76, 357 P.3d 547; and *Teamsters Local 222 v. Utah Transit Authority*, 2018 UT 33, 424 P.3d 892. There is thus no basis for the majority's creation or preservation of an alternative "likely to evade review" prong based on the "likely actions of a party" that is immune to ripeness concerns and separate and distinct from our doctrine of voluntary cessation. *See supra* ¶ 20.

### A. *Kearns-Tribune*

¶105   The majority claims that in the *Kearns-Tribune* case, the Salt Lake County Commission released the minutes of an allegedly unlawfully closed session "[w]hile the challenge was pending" in order to "argue[] that the minutes' release mooted the suit." *See supra* ¶ 23. But that is incorrect. While the opinion's mootness analysis is cursory, there is no evidence that the Commission released the minutes in order to moot the case. It was the *newspaper* that had an interest in arguing—and did argue—that the case was moot. *See Kearns-Tribune*, 2001 UT 55, ¶ 32 ("Kearns-Tribune also argues that because the minutes of the closed portion of the meeting have already been voluntarily released and made public, this case is now moot, and if this court were to issue an opinion, to do so would be to issue an advisory opinion."). It was Kearns-Tribune, not the Commission, that anticipated a less favorable ruling on appeal and was seeking to preserve the district court's interpretation of the Utah Open and Public Meetings Act.

¶106 Even if the Commission *had* acted strategically, *Kearns-Tribune* never held that the case qualified for our exception to mootness because the relevant issue was "likely to evade review"

---

exception-to-mootness framework or a voluntary cessation framework. This is problematic.

due to the "likely actions of a party." *See supra* ¶ 20. Instead, the court applied our traditional approach, holding that "because of the *nature* of the dispute," the issue "could otherwise escape judicial review." *Kearns-Tribune*, 2001 UT 55, ¶ 33 (emphasis added). Our later *Utah Transit Authority* opinion mistakenly claimed that *Kearns-Tribune* stood for a different proposition—in a short footnote to a sentence that briefly listed the different situations in which we had found an exception to mootness. *See* 2012 UT 75, ¶ 37 n.21 (asserting without analysis that *Kearns-Tribune* had held that "a closed meeting in violation of the Public Meetings Act was a matter that would evade review because public officials were likely to publish the notes from the closed portion of the meeting before the matter was litigated"). But the *Kearns-Tribune* opinion itself does not support that characterization. And our more recent opinion *State v. Steed* corrects the record—accurately characterizing *Kearns-Tribune* as a case involving an issue "inherently short in duration." *See* 2015 UT 76, ¶¶ 9, 11 n.9.

¶107 The majority's reliance on *Kearns-Tribune* is also problematic for another reason. The *Utah Transit Authority* opinion establishes that a plaintiff who receives a ruling from a district court is in no position to argue that the case is likely to evade review. *See* 2012 UT 75, ¶ 38. Yet Kearns-Tribune did receive a district court ruling—and thus never should have had its claim reviewed under our mootness exception. The majority accepts the holding of *Utah Transit Authority* on this issue. *See supra* ¶ 57 n.14 (noting that Widdison cannot qualify for the mootness exception under *Utah Transit Authority* because she "did receive a ruling from the district court"). And it should therefore also acknowledge that *Kearns-Tribune* is no longer good law on this point.

### B. *Anderson*

¶108 The majority also relies on *Anderson* for its assertion that our mootness exception applies when the actions of a party make the case likely to evade review. *See supra* ¶ 22. And granted, *Anderson* said that "it [was] difficult to conceive" of any claim like the plaintiff's "that will not become technically moot before it wends its way through the adjudicative process." 2006 UT 79, ¶ 11. It also stated that "once a challenge is initiated, law enforcement will have every incentive to immediately file the documentation supporting the search, thereby mooting the particular claim." *Id.*

¶109 But *Anderson* does not provide a firm foundation for the majority's holding. For one thing, *Anderson* seems to have expressly admitted to treating mootness as a mere "matter of convenience" or

"judicial discretion." *See id.* (holding that Anderson's claim was a "quintessential example of a claim that, while technically moot, *deserves* review") (emphasis added); *id.* ¶ 10 (quoting *Wickham v. Fisher*, 629 P.2d 896, 899–900 (Utah 1981) for the proposition that "[t]he law provides no exemption from judicial scrutiny of unlawful acts which are likely to be repeated because they do not fall within the usual principles of standing and justiciability"). *Anderson* thus applied a version of the so-called "public interest exception" that we explicitly repudiated in *Utah Transit Authority*. *See* 2012 UT 75, ¶¶ 18–20, 27 (noting that our case law has "long endorsed" the position that "[m]ootness is a constitutional principle" that speaks to limits on our "judicial power" under article VIII of the Utah Constitution).

¶110   The court revealed its fast-and-loose approach to mootness in another way. The Fourth District Court—the defendant in *Anderson*—argued that the case was moot only in the context of its argument that Anderson lacked standing to pursue his claims. And once we understand what Anderson's claims were, it is evident that *Anderson* conducted an unnecessary mootness exception analysis. Yes, Anderson had initially been unable to obtain copies of the documents that had supported the warrant authorizing the search of his property. *Anderson*, 2006 UT 79, ¶ 1. And the Fourth District Court did argue that "Anderson's claims became moot when the search warrant and other related documents were filed with the court" in connection with Anderson's lawsuit. *Id.* ¶ 9. But Anderson's lawsuit sought more relief than the release of his own personal records. "Anderson argue[d] that *the practice* of issuing a warrant without retaining copies of the warrant or the material supporting the request for the warrant violates the . . . United States Constitution, . . . the Utah Constitution, and Utah Code." *Id.* ¶ 6 (emphasis added). He accordingly requested that we (1) "issue a declaratory judgment enjoining *this practice* and declaring it to be a violation of his constitutional rights," (2) require the Fourth District "to retain copies of all the search warrants it issues, as well as the supporting material associated with those warrants," (3) "certify a class of similarly situated plaintiffs," and (4) "award him his attorney fees." *Id.* (emphasis added). The Fourth District Court's release of Anderson's records did not grant Anderson all the relief he sought. For that reason alone, the case was not moot.[28]

---

[28] None of this should be taken as an endorsement of the *Anderson* court's implicit holding that Anderson also retained

(continued ...)

A.C.J. LEE, concurring in the judgment

¶111   *Anderson*'s mootness exception analysis was irrelevant to the defendant's argument, but it reached the issue anyway based on a view of mootness and the judicial power that is incorrect under *Utah Transit Authority*. Its holding cannot support the majority opinion.[29]

### C. *McBride*

¶112   *McBride* is the case that most clearly stands for the majority's alternative "likely to evade review" prong. In that case, we held that bar exam disputes were likely to evade review because the fact the exam was offered every six months meant that "an aggrieved applicant could retake the Exam and be admitted to the Bar before the issue could be litigated." *McBride*, 2010 UT 60, ¶ 15. But the *McBride* decision is also the case most in tension with our recent case law. Because *McBride* violates the holdings of *Utah Transit Authority*, *Steed*, and *Teamsters*, it likewise cannot support the majority opinion.

1. Inconsistent with Our Jurisdictional Case Law

¶113   Even more so than *Anderson*, the *McBride* opinion was based on the mistaken belief that mootness was simply a "matter of convenience" or "judicial discretion." In reaching out to rule on McBride's moot case, we openly declared that we were "exercis[ing] our *discretion* to address the issues raised by Mr. McBride." *Id.* ¶ 15 (emphasis added). Again, this approach is incompatible with the jurisdictional approach to mootness articulated in decisions like *Utah Transit Authority* and *In re Gestational Agreement*, 2019 UT 40, ¶ 12, 449 P.3d 69. *See supra* ¶ 77.

---

standing to pursue these other claims. It is quite possible that the case should have been dismissed for lack of standing.

[29] Contrary to the majority's assertion, I am not suggesting that *Anderson*'s precedential value is diminished because I've identified an alternate ground for the court's decision fourteen years after the fact. *See supra* ¶ 52. I am noting that the fact the exception-to-mootness analysis was completely unnecessary to the outcome of the case is yet another indication that the *Anderson* Court did not seem to share the constitutional view of mootness that this court articulated in *Utah Transit Authority* (six years after we issued that opinion).

¶114   The majority criticizes my focus on the word "discretion." *See supra* ¶¶ 48–49. But the focus is not mine alone (or was not until today)—it is *this court's*. It was our opinion in *Utah Transit Authority* that highlighted the problematic implications associated with the word "discretion" as used in our mootness jurisprudence. *See* 2012 UT 75, ¶ 17 (holding that mootness is not a "purely prudential principle of judicial discretion"); *see also id.* ¶ 18 (holding that mootness is "not a simple matter of judicial convenience or ascetic act of discretion"); *id.* ¶ 27 (holding that mootness is not "a mere matter of convenience or judicial discretion"); *id.* ("Mootness is a constitutional principle, not a matter left to our discretion to decide which cases should be spun out and which cut off based on some vague sense of fairness or importance of the issue.").

¶115 Perhaps the majority finds the word "discretion" unproblematic because it disagrees with *Utah Transit Authority*'s holding that the doctrine of mootness is a constitutional limit on the judicial power. *See supra* ¶ 56 n.13 (noting that two members of this court have "expressed some concerns with the originalist analysis *Utah Transit Authority* employed to reach its conclusions about the meaning of the term 'judicial power' in the Utah Constitution"). But only two members of this court have expressed such concerns. *See In re Gestational Agreement*, 2019 UT 40, ¶¶ 88–93 (Pearce, J., concurring, joined by Himonas, J.). No amount of "concern" of two members of this court overrules precedent. And our precedent holds that "mootness [is] rooted in constitutional soil."[30] *See supra* ¶ 48; *Salt Lake County v. State*, 2020 UT 27, ¶ 37 n.44, 466 P.3d 158 ("[T]he principle against deciding abstract questions is firmly established in our case law . . . . So even though it is possible that, in a future case, a historical analysis of the original meaning of the Utah Constitution

---

[30] The majority repeatedly claims that it will not overrule cases "until a party attempts to shoulder its burden of overturning precedent." *See supra* ¶ 25 n.6; *see also* ¶ 37. But these are hollow claims in light of this attempt to cast shade on our case law reaffirming that the doctrine of mootness is constitutionally imposed. And of course the majority's standard also runs counter to its decisions to reject *Utah Transit Authority*'s holding on the effect of cases mooted as a function of the parties' actions, *see supra* ¶¶ 76–88, and disregard *Teamsters*' holdings on mootness, ripeness, and the proper framework for analyzing the "likely actions of a party," *see supra* ¶¶ 89–92.

may lead us to rethink the way our case law has described the limits of the judicial power, we decline to revisit that case law unnecessarily here.").

2. Inconsistent with the *Steed* Standard

¶116   It is true that our opinion in *State v. Steed* offered a possible basis for reconciling *McBride*. *See supra* ¶ 71 n.17. But just as *Utah Transit Authority* failed to fully grapple with the problems of *Kearns-Tribune*, *Steed* failed to fully confront *McBride*.[31]

¶117 First, *Steed* openly acknowledged that *McBride* had "departed from our traditional approach." 2015 UT 76, ¶ 11 n.9. And it affirmed our *Utah Transit Authority* holding that in order to qualify for our mootness exception, an issue must be by its very nature

---

[31] To be clear, my contention that *Steed* failed to follow its own standard to its logical conclusion is not an attempt to relitigate *Steed* or to slight the majority in that case; I fault myself for committing the same error in *Utah Transit Authority*. *See supra* ¶¶ 71 n.17; 106; 116. In any case, the *Steed* Court declined to overrule *McBride* on judicial restraint grounds. *See* 2015 UT 76, ¶ 11 n.9 (determining that overruling *McBride* was not necessary to dispose of the case and noting that the parties had not briefed the matter).

Likewise, I am not asking the court to "take a leap of faith and believe that five justices of the unanimous court in *Utah Transit Authority* mistakenly cited *Kearns Tribune* and *McBride* to explain the exception, when, in fact, they meant to overturn those cases." *Supra* ¶ 40. I don't advocate that *Utah Transit Authority* "meant" to overturn any of those cases—as the majority notes (repeatedly), it cited the disputed cases favorably. But just because *Utah Transit Authority* respected the outcomes of the cases it cited (in listing the types of issues that had previously been found to qualify for the exception) does not mean that the reasoning it gave for declining to apply the exception in *Utah Transit Authority* jibed with the reasoning of those prior cases. And given the fact that (1) none of the past cases were being challenged and (2) the main body of the opinion characterized them as cases involving issues of "inherently short duration" (rather than issues mooted as a "function of the parties' actions"), it is not surprising that the court did not immediately recognize that the reasoning of the cases it summarized in footnotes was at odds with the reasoning of the holding it was issuing that day—nor is it surprising that the court did not reach out to overrule the reasoning or the outcomes of those decisions.

likely to evade review. *See id.* ¶ 1 (holding that Steed's case did not warrant the application of our mootness exception "because a freeze order under the Asset Preservation Statute is not inherently short in duration and thus is not likely to evade review").

¶118 *Steed* also rearticulated a standard for determining whether a case is "likely to evade review" that runs counter to the *McBride* holding. *McBride* found that bar exam disputes are rapidly resolving issues because "an aggrieved applicant *could* retake the Exam and be admitted to the Bar before the issue could be litigated." 2010 UT 60, ¶ 15 (emphasis added). But the *Steed* court held that while "in the past we ha[d] been somewhat loose in our articulation of the third element of our mootness exception"—alternatively requiring that an issue be "*capable* of evading review" and "*likely* to evade review"—"[u]pon reflection . . . the '*capable* of evading review' articulation of the third element is overly broad." 2015 UT 76, ¶ 8 (emphasis added) (citation omitted) (internal quotation marks omitted). We went on to "clarify that the proper articulation of our standard is the one used herein—'*likely* to evade review,'" and expressly "disavow any language in our prior cases stating otherwise." *Id.* (emphasis added). Because *McBride* allows for even the *possible* actions of a party to trigger our mootness exception, it has been overtaken by *Steed*.

¶119 The majority is correct that my view of *Steed*'s incompatibility with *McBride* did not carry the day in *Steed*. *See supra* ¶¶ 36–38. But I openly acknowledge that *Steed* did not feel the need to override *McBride* in that case. *See supra* ¶¶ 116; 116 n.31. So I am not suggesting that we do something underhanded or "give *stare decisis* respect to a conclusion we explicitly refused to reach." *See supra* ¶ 38. I'm just asserting that we need to actually give *stare decisis* effect to our central holding in that case—that an issue must be *likely* to evade review, not *capable* of evading review. *Steed*, 2015 UT 76, ¶ 8. It is impossible to apply that standard and reach the same result in *McBride*. *See* 2010 UT 60, ¶ 15 (finding an exception to mootness in part because "an aggrieved applicant *could* retake the Exam and be admitted to the Bar before the issue could be litigated" (emphasis added)). *Steed* was thus more than "an important clarification" on the third prong of our mootness exception, *supra* ¶ 47; it was a revision that undermined the core basis for our holding in the *McBride* case. For the same reasons the United States Supreme Court did not hesitate to overrule *Quill* and *Bellas Hess* in *Wayfair*, *see supra* ¶ 83, we should not hesitate to expressly overrule *McBride*. *See* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 397 (2016)

("Courts generally give less precedential weight to decisions that are isolated and haven't been followed (or acquiesced in) . . . ."); *id.* at 397–98 (explaining that overruling is appropriate when "related principles of law have so changed as to leave a particular precedent outdated"); *id.* at 398 ("When a particular precedent stands alone or is at odds with related legal doctrine, it's often a sign that the particular case was poorly reasoned or incorrect.").

¶120  *Steed*, moreover, is just one small part of my analysis. A more central problem is the fact that the majority's approach is completely inconsistent with *Utah Transit Authority* and the post-*Steed* case of *Teamsters. See supra* ¶¶ 76–103. And the majority cannot seriously claim to be "honor[ing] *stare decisis*" in "reject[ing] the invitation to disregard our case law" without invitation from the parties,[32] *supra* ¶ 37, when it is overruling key holdings of *Utah Transit Authority* and *Teamsters* without invitation or briefing from the parties.

3. Inconsistent with *Teamsters*

¶121  Finally, *McBride* is at odds with our mootness-ripeness decision in *Teamsters* because it incorrectly defined the scope of the relevant controversy that was capable of evading review and took into account the voluntary actions of the *plaintiff.*

---

[32] The correction and harmonization of our law is not contingent on a request from the parties. We made this point clear in another recent case that the majority seems intent on overriding—*Blanke v. Utah Bd. of Pardons & Parole*, 2020 UT 39, 467 P.3d 850, where we held that "we have the power to revisit precedent at any time" and the authority to "clarify, refine, or reconcile our past precedent" even without an explicit request from the parties. *Id.* ¶ 11 n.6 (citation omitted) (internal quotation marks omitted). *Blanke* notes our preference for adversarial briefing before overruling or reconciling our precedent. *See id.* But it also makes clear that we need not await a request from the parties that we get the law right, and notes our prerogative of seeking supplemental briefing where we lack an express request and find adversary briefing helpful. *See id.; see also Thomas v. Hillyard*, 2019 UT 29, ¶ 18, 445 P.3d 521 (noting that the need to overrule existing precedent may be most pressing where our case law is in a state of internal conflict; overruling *Jensen v. Young*, 2010 UT 67, 245 P.3d 731, without invitation from the parties in light of the existence of "two lines of cases" that had "taken inconsistent and confusing paths").

¶122   In *McBride*, we found that disputes over bar exams are capable of evading review *generally* because they are offered every six months and *any* aggrieved *applicant* "could retake the Exam and be admitted to the Bar before the issue could be litigated." 2010 UT 60, ¶ 15. But as explained above, *Teamsters* held that the relevant inquiry in determining whether a case is justiciable is whether our opinion can affect the interests of a specific party in a specific controversy at the time we rule on the case. *See supra* ¶¶ 89–92. Under the holding of *Teamsters*, we would have dismissed McBride's case as moot because "[t]he relevant controversy [was] not whether [McBride] ha[d] some general right to [submit exam answers late]; it is whether [McBride] ha[d] a right to [submit exam answers late] in this instance." 2018 UT 33, ¶ 13. And since McBride "ha[d] indicated [his] desire to [not submit his answers late] for the time being," by taking and passing a new exam, "our decision could not affect [this applicant] *at this time*." *Id.* (emphasis in original). We would have ruled that although the Bar "want[ed] us to decide th[e] case to avert a future case," "such a decision would run afoul of the doctrine of ripeness." *Id.* ¶ 14.

¶123   *Teamsters* also held that the actions of a plaintiff are not relevant to the voluntary cessation inquiry because a plaintiff has no incentive but the resolution of the controversy. *See supra* ¶¶ 93–95. Under current precedent, then, we would have said that McBride was "not [a] defendant[] who sought to moot a case when . . . sued for violating a plaintiff's legal rights," but rather a "plaintiff[] seeking to establish [his] own legal rights." *Teamsters*, 2018 UT 33, ¶ 18. Therefore, "the strategic pattern contemplated in the voluntary cessation line of cases is not implicated." *Id.* We might also have added that because we had "no reason to doubt the sincerity of [McBride's] decision to repudiate [his] initial inclination" to submit his old answers late, his decision was "unlikely to have been influenced by any strategic attempt to evade judicial review." *Id.* ¶ 19.

¶124 *McBride* is thus a faulty basis for the majority's reformulation of the third prong of our mootness exception for multiple reasons: (1) it failed to recognize mootness as a jurisdictional requirement (contra *Utah Transit Authority* and *In re Gestational Agreement*), (2) it deemed a case "likely to evade review" for being merely "capable of evading review" (contra *Steed*), and (3) in making its mootness determination, it misidentified the relevant "controversy" and considered the actions of the *plaintiff* (contra *Teamsters*).

### III. Stare Decisis

¶125   Today the court dismisses Widdison's claim in part on the ground that she has not shown that she was "paroled specifically for the purpose of preventing this court from addressing the issues she raises" as "part of a[n] . . . effort to systemically grant parole to keep those issues from this court." *Supra* ¶ 58. The majority cites no authority for its establishment of a new legal standard—its decision to consider whether a specific defendant is *systematically surrendering* whenever a certain issue is appealed. *See supra* ¶ 62 ("We would share Widdison's concern if it appeared that the Board was consistently paroling inmates in order to avoid review of its practices."). There is nothing in our case law that suggests that a court should consider the defendant's larger motivations in mooting a specific case. Our established case law sets a different standard. So long as the defendant's decision to stop violating a specific plaintiff's rights is final—the defendant is not just temporarily pausing its illegal behavior against a specific plaintiff—the case is moot, our jurisdiction is at an end, and no "exception" can cure it. *See Teamsters Local 222 v. Utah Transit Auth.*, 2018 UT 33, ¶¶ 18–20, 424 P.3d 892.

¶126   In rejecting this standard and establishing a new one, the majority claims that it is preserving an alternative formulation of the "likely to evade review" prong of our mootness exception out of fidelity to *Kearns-Tribune Corp. v. Salt Lake Cnty. Comm'n*, 2001 UT 55, 28 P.3d 686; *Anderson v. Taylor*, 2006 UT 79, 149 P.3d 352; and *McBride v. State Bar*, 2010 UT 60, 242 P.3d 769. But this is problematic even assuming that these cases all stand for the propositions for which the majority cites them. *But see supra* Part II. Even if that were true, the majority still would be in no position to reinstate those propositions without directly confronting and overruling our more recent precedent that contradicts the holdings in those cases.[33] Under established principles of *stare decisis*, the court should conclude that the cited premises of our older cases have been overtaken by more recent authority.[34] Yet the majority does the opposite—it concludes

---

[33] Per the majority's proposed standard, it would be in no position to do so without invitation and briefing from the parties. *See supra* ¶¶ 25; 25 n.6; 37.

[34] *See Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12 n.13, 416 P.3d 389 (crediting "recent decisions" and holding that judicial deference to local agencies' interpretations "cannot stand in view of subsequent developments in our precedent"); *Agostini v.*

(continued ...)

that our older cases control, and somehow override our more recent authority (*Utah Transit Authority*, *In re Gestational Agreement*, *Steed*, and *Teamsters*). The court's opinion thus establishes two different tests for analyzing the same voluntary actions of a defendant. And it contains strong echoes of the approach to mootness that we rejected in *Utah Transit Authority*.

### A. The Importance of Crediting More Recent Authority

¶127 Our mootness cases, as noted, are not a model of clarity. In the past, we confusingly blurred voluntary cessation and the third prong of our public interest exception, making explicit discussion of voluntary cessation less frequent.[35] But we have made strides of late to bring clarity and focus to this area.

¶128 Despite these efforts, some lines of inconsistency remain. This is an inevitable (if unfortunate) aspect of the judicial process. As we refine the framework for our analysis over time, some of the language (and sometimes the holdings) of our older precedents may no longer be viable. When that happens, our doctrine of *stare decisis* yields a clear path forward: We credit more recent case law and repudiate—and overrule if necessary—older cases that have been overtaken.[36] We have even disavowed statements in a more recent

---

*Felton*, 521 U.S. 203, 235 (1997) ("The doctrine of *stare decisis* does not preclude us from recognizing the change in our law and overruling *Aguilar* [*v. Felton*] and those portions of [*Sch. Dist. of City of Grand Rapids v.*] *Ball* inconsistent with our more recent decisions.").

[35] Again, the majority seems to recognize that our older cases discussing whether issues are "likely to evade review" "because of the likely actions of a party" are really voluntary cessation cases. *Supra* ¶ 24 n.5.

[36] *See Biesele v. Mattena*, 2019 UT 30, ¶ 34 n.5, 449 P.3d 1 (acknowledging "some tension in our case law" but siding with the decision that was "more recent than the cited cases" in part because it was "clear and straightforward and ha[d] not been called into question by the parties"); *Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 22, 416 P.3d 635 (recognizing that that the court had "more recently" clarified that the "view of the presumption of constitutionality" expressed in older decisions was "no longer good law"); *Outfront Media, LLC*, 2017 UT 74, ¶ 12 n.13, (siding with "recent decisions" and holding that judicial deference to local agencies' interpretations of their own regulations "cannot stand in

(continued ...)

case once it became clear that its attempts to reconcile with older cases had failed.[37] Yet the majority does just the opposite, ignoring or cabining clear, recent case law in order to resurrect older and vaguer precedents.

¶129 The decision to formally disavow inconsistent language in our older case law is a straightforward move here. *Utah Transit Authority*, *Steed*, and *Teamsters* already clarified how to define the relevant controversy and explained the effect of a defendant's voluntary actions on justiciability—the issue at the heart of this case. All we need to do today is read this past case law in light of our more recent opinions. *See* Bryan A. Garner et al., The Law of Judicial Precedent 300 (2016) ("A court of last resort generally

---

view of subsequent developments in our precedent"); *see also Agostini*, 521 U.S. at 236 (overruling past decisions "to the extent [they] [we]re inconsistent with [the court's] current understanding of the Establishment Clause" because the court's "Establishment Clause jurisprudence ha[d] changed significantly"); *Fulton Corp. v. Faulkner*, 516 U.S. 325, 345–46 (1996) (holding that past decisions were "no longer good law under the Commerce Clause" because "to the extent that [they] evaluated a discriminatory state tax under the Equal Protection Clause, time simply has passed [them] by"); *United States v. Gaudin*, 515 U.S. 506, 521 (1995) ("[W]e think *stare decisis* cannot possibly be controlling when[] . . . the decision in question has been proved manifestly erroneous, and its underpinnings eroded, by subsequent decisions of this Court."); *Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989), *superseded by statute on other grounds*, (noting that when "the growth of judicial doctrine" or "subsequent changes or development in the law" have "removed or weakened the conceptual underpinnings from [a] prior decision," or "later law has rendered [a] decision irreconcilable with competing legal doctrines or policies," the Court "has not hesitated" to overrule it); Bryan A. Garner et al., The Law of Judicial Precedent 397–98 (2016) (explaining that overruling is appropriate when "related principles of law have so changed as to leave a particular precedent outdated").

[37] *See Salo v. Tyler*, 2018 UT 7, ¶ 2, 417 P.3d 581 ("disavow[ing] any suggestion" in *Orvis v. Johnson*, 2008 UT 2, 177 P.3d 600 "that our Utah [summary judgment] standard is distinct from the federal standard" because "confusion ha[d] continued" in spite of the opinion's efforts to reconcile that position with our case law).

follows its decision in the most recent case, which *must have* tacitly overruled any truly inconsistent holding." (emphasis added)). There is no reason for us to reframe our past cases to cling to outdated principles or establish new ones that they do not support.

¶130 *Stare decisis* compels us to respect decisions like *Utah Transit Authority* and *Teamsters* by either finding a way to harmonize past case law with their holdings or acknowledge that past case law is overruled to the extent of any conflict. What *stare decisis* does not allow—let alone compel us to do—is ignore our recent precedent and rewrite older cases while claiming that we are faithfully applying them.

### B. The Majority Creates Two Tests
### Governing the Same Set of Facts

¶131 In separating *McBride* from *Teamsters*, the majority also creates two different tests for analyzing the same voluntary actions of a defendant—opening the door to two different results under the *same* set of facts. Under the *Teamsters* voluntary cessation approach, a defendant's actions granting the plaintiff all the relief she seeks would prevent us from ruling on the case (unless the defendant were only temporarily halting behavior against that specific plaintiff at that specific time). Cases such as Widdison's would be dismissed as a matter of course. Under the majority's reformulated mootness exception, by contrast, that same case *could* be reviewed (temporary, specific cessation or not) because the defendant's overall "systemic[]" efforts to moot a certain issue (not a specific controversy) render the case "likely to evade review." *See supra* ¶ 58; *see also supra* ¶ 62 ("We would share Widdison's concern if it appeared that the Board was consistently paroling inmates in order to avoid review of its practices."). This is not a recipe for principled judging. The prospect of two competing standards is yet another reason to reject the majority's approach to our exception to mootness.

### C. *We Rejected the Majority's Approach to Mootness in*
### Utah Transit Authority *and* In re Gestational Agreement

¶132 The court's suggestion that we should be free to review an individual, otherwise moot case if the Parole Board were in the business of "systemically" paroling inmates (i.e., giving up) to avoid an adverse ruling, *supra* ¶ 58, is itself a significant departure from our case law. *See also supra* ¶ 3 (dismissing Widdison's case as moot because "Widdison has not convinced us that if we do not decide her case, we will likely deprive ourselves of any opportunity to review

the types of issues she raises"); *supra* ¶ 62 ("We would share Widdison's concern if it appeared that the Board was consistently paroling inmates in order to avoid review of its practices."). Intimating that an issue can't *really* be non-justiciable if we think that the parties (as opposed to the nature of the dispute itself) won't ever let us rule on it implies that we have some right to rule on certain issues—whether there is a live controversy or not. The majority's view advances the theory that mootness is free of constitutional limitations—that "mootness [is] a principle of our own creation . . . that we have the power to abolish . . . at our whim[] on the ground[] . . . that the question presented is sufficiently important or interesting to merit our attention and to justify the clarification of Utah law through publication of an opinion." *Utah Transit Auth.*, 2012 UT 75, ¶ 17. If this is in fact what is driving the majority, *see supra* ¶ 25 n.6, it needs to justify its decision to reverse our holdings in *Utah Transit Authority*, 2012 UT 75, ¶¶ 17–18, 27, *In re Gestational Agreement*, 2019 UT 40, ¶ 12, 449 P.3d 69, and others under our doctrine of *stare decisis*. Its failure to do so highlights a further problem with the majority opinion.

## IV. Conclusion

¶133 The majority frames our disagreement as one over whether we overruled our untraditional likely-to-evade-review case law even though we "(1) cited those cases favorably . . . and (2) *expressly declined to overrule them* in a subsequent case." *Supra* ¶ 27 n.7. But this avoids the actual question before us. The real question we face today is whether we should adhere to and extend a variation of an exception to mootness that requires us to (1) ignore—diminish or outright overrule—our core holdings on the exception to mootness in favor of citations and parentheticals to older case law;[38] (2) interpret *Steed*'s decision not to reach out to overrule *McBride* (which it recognized as a "depart[ure] from our traditional approach") as "honor[ing]" and "expressly" confirming *McBride*;[39] and (3) contradict our case law on ripeness and voluntary cessation, creating two contradictory tests for analyzing the same set of facts.[40]

¶134  I answer this question in the negative. I thus concur in the majority's decision to dismiss this case as moot but decline to join its

---

[38] *See supra* ¶ 53.

[39] *Supra* ¶ 27, 36–37.

[40] *See supra* ¶¶ 73, 100 n.26, 103, 107, 131.

rationale. The court goes out of its way to preserve a dubious vision of a body of older case law at the expense of clearer, more recent precedent. In so doing, it undermines constitutional limits on the judicial power, injects confusion into our case law, and turns its back on some central tenets of the doctrine of *stare decisis*. I see a much clearer path to today's decision. We should dismiss this case under the standards set forth in *Utah Transit Authority*, *Steed*, and *Teamsters*.

¶135 In charting a different course, the majority effectively overrules important elements of our holdings in each of these cases. And it does so in the same opinion in which it claims to be "stick[ing] with our case law" and "honor[ing]" and "repect[ing] *stare decisis*." *Supra* ¶¶ 37, 56. I concur in the judgment of the court but respectfully disagree with the disruptive basis for the majority opinion.

———————